# DEVOE MANUFACTURING COMPANY, Petitioner.

ORIGINAL.

Decided May 7th, 1883.

*Jurisdiction of District Courts—New Jersey—New York—State Boundaries.*

1. The District Court of the United States for the District of New Jersey has jurisdiction of a suit in admiralty, *in personam,* against a New York corporation, where it acquires such jurisdiction by the seizure, under process of attachment, of a vessel belonging to such corporation, when such vessel is afloat in the Kill van Kull, between Staten Island and New Jersey, at the end of the dock at Bayonne, New Jersey, at a place at least 300 feet below high-water mark, and nearly the same distance below low-water mark, and is fastened to said dock by means of a line running from the vessel and attached to spiles on the dock.

2. A vessel so situated is within the territorial limits of the State of New Jersey and of the District of New Jersey, and is not within the territorial limits of the State of New York, or of the Eastern District of New York.

3. The subject-matter of the dispute as to boundary between New York and New Jersey explained, and the settlement as to the same made by the agreement of September 16th, 1833, between the two States, as set forth in, and consented to by, the act of Congress of June 28th, 1834 (chap. 126, 4 Stat. 708), interpreted.

4. When Congress enacts that a judicial district shall consist of a State, the boundaries of the district vary afterwards as those of the State vary.

Petition for writ of prohibition to the District Court of the United States for the District of New Jersey, proceeding as a court of admiralty. The sole question at issue was whether that court had jurisdiction in admiralty over a vessel afloat but fastened by a hawser to the end of a dock in the Kill van Kull, between Staten Island and New Jersey, at a place about three hundred feet distant in the stream from the line of ordinary low-water mark.

*Mr. Henry J. Scudder* for petitioner.—I. The office of the writ of prohibition is to prevent an unlawful assumption of jurisdiction.

The writ lies to a court of admiralty only when that court is acting in excess of its jurisdiction. *Ex parte Gordon,* 104 U. S. 515; *Ex parte Easton,* 95 U. S. 68.—II. The District

Court of New Jersey is proceeding here as a court of admiralty, but it gains jurisdiction of the respondent only by excess or abuse of power in attaching property outside the limits of its district and forcing respondent to appear in order to preserve its property. The respondent or petitioner here has no redress by appeal. If it appear, in order to try the merits of the action, it confesses jurisdiction; appearing specially to deny jurisdiction only, it is met by an order denying its motion for relief from the cognizance of the court, and has no appeal from that order. *Toland* v. *Sprague*, 12 Pet. 300.—III. In subdividing the State into districts by the Judiciary Act of 1789, the legislature intended to prescribe distinct and understood boundaries to each district. To give to the act any fluctuating power would introduce conflict and confusion where certainty was essential.—IV. In constituting the States of New Jersey and New York respectively districts, the legislature designed to conform these districts to then understood and recognized jurisdictional limits of the two States. Congress was sitting in 1789 in the city of New York, and possessed ample information as to what lines bounded these State jurisdictions when the districts were created. It cannot be urged that the " State of New York " was adopted in a loose sense, as, in popular expression, for a district, such district to be subject to the contingent result of a dispute between that State and New Jersey, in respect to boundary ; such a course would have fallen short of the purpose of ordinary legislation, and cannot be presumed to have existed in a species of legislation that above all others addresses itself to precision. In the formation of districts, Congress was dealing with jurisdictional subjects, and these always involve clear definitions. If any matter may be left to contingent explanations or events, jurisdiction cannot; that must be " ascertained," and certain. In using the " State of New York " as a term, the legislature had considered and determined upon exact lines as containing that State. True, when the lines may have fallen upon a sea shore or a river subject to ebb and flow of tide, they might not be so geometrically accurate as upon courses and distances, but the logic of law would undergo no violation in that respect. Low-

water mark is a certain limit, and if the State of New York had that as one of its boundaries, it sufficed and answered every demand of preciseness.—V. The jurisdiction of the State of New York in 1789, extended to low-water mark along the Jersey shore, including the Kill van Kull, and the district of New York was co-extensive with such jurisdictional limits of the State. It seems clear that in the conveyance made by the Duke of York of the territory of East Jersey, he was governed by the contemporaneous understanding that the Kill van Kull was a part of the Hudson River, and that by such conveyance he limited the territory conveyed to the western side of said waters or the shore thereof. The grant by James must be treated as a royal grant, and nothing held by intendment against it or in favor of the grantee. *Martin* v. *Waddell*, 16 Pet. 367. Hudson River being thus understood to embrace Kill van Kull, and entirely excluded from the conveyances by James, remained the property of the latter, and so of the province of New York, and by conquest through the Revolution, of the State of New York. None of the States enlarged its territorial limits over those in its provincial character by the mere operation of independence from the sovereignty of the mother country, and the rule applied to New Jersey by the United States Circuit Court in *Corfield* v. *Coryell*, as to the Delaware bay and river, is applicable to the eastern shore of that State upon the waters of the Kill van Kull and Hudson River. *Corfield* v. *Coryell*, 4 Wash. C. C. R. 371; *Handly's Lessee* v. *Anthony*, 5 Wheat. 374. The limits of New Jersey as a province were recognized by the authorities of that State as the shore or low-water mark of the waters of the Hudson and New York Bay so-called, inclusive of the Kill van Kull, and continued so to be recognized until the beginning of the present century. Opinion of Judge Elmer, *State* v. *Babcock*, 1 Vroom, 29, 32.—VI. The jurisdiction of the State of New York, therefore, in 1789, covered the place of the seizure under consideration here, and the District of New York equally covered it, and unless some change has been effected by national legislation in the extent of that district it still embraces it, and the District Court of New Jersey has no jurisdiction over it.

*Mr. Franklin A. Wilcox*, opposing.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

The question involved in this case is as to the territorial jurisdiction of the District Court of the United States for the District of New Jersey. In April, 1882, a libel in admiralty, *in personam*, for damages growing out of a collision, was filed in that court against the Devoe Manufacturing Company, a New York corporation. In October, 1882, process was issued by the court to the marshal, commanding him to cite the respondent if it should be found in the district, and, if it could not be there found, to attach its goods and chattels within the district. On this process the marshal seized a tug belonging to the corporation and made return that he had attached the tug, as its property. At the time of the seizure the tug was afloat in the Kill van Kull, between Staten Island and New Jersey, at the end of a dock at Bayonne, New Jersey, at a place at least 300 feet below high-water mark and nearly the same distance below low-water mark, and about half a mile from the entrance of the Kill into the bay of New York, and was fastened to the dock by means of a line or fastening running from the tug and attached to spiles on the dock, and was lying close up to the dock. The respondent, insisting that the tug, when seized, was within the exclusive jurisdiction of the Eastern District of New York, and not within the jurisdiction of the District of New Jersey, applied to the court to set aside the service of the process. The court denied the application, holding that the tug, being, when seized, fastened to a wharf or pier on the western side of the Kill van Kull, was within the exclusive jurisdiction of the district of New Jersey. The respondent now applies to this court to issue a writ of prohibition to the district court, restraining it from exercising the jurisdiction so asserted.

By section 2 of the act of September 24th, 1789, " to establish the judicial courts of the United States," chap. 20, 1 Stat. 73, the United States were divided "into thirteen districts, to be limited and called as follows: . . . one to consist of the State of New York, and to be called New York district ; one

to consist of the State of New Jersey, and to be called New Jersey district," and, by section 3, a court called a district court was created in each of said districts, and, by section 9, exclusive original cognizance was given to such district courts, of all civil causes of admiralty and maritime jurisdiction, within their respective districts. By these provisions the territorial limits of the respective States of New York and New Jersey were made the territorial limits of the respective judicial districts of New York and New Jersey.

By section 1 of the act of April 9th, 1814, chap. 49, 3 Stat. 120, it was enacted that the State of New York "shall be and the same is hereby divided into two districts, in manner following, to wit: the counties of Rensselaer, Albany, Schenectady, Schoharie, and Delaware, together with all that part of the said State lying south of the said above mentioned counties, shall compose one district, to be called the Southern District of New York; and all the remaining part of the said State shall compose another district, to be called the Northern District of New York." By virtue of this act all that part of the State of New York which was bounded on the line between New York and New Jersey fell within the Southern District of New York. The boundary line between the States still formed the boundary line of jurisdiction between the districts.

By section 3 of the act of April 3d, 1818, chap. 32, 3 Stat. 414, the counties of Albany, Rensselaer, Schenectady, Schoharie, and Delaware were transferred from the Southern District of New York to the Northern District of New York, but the boundaries of the Southern District of New York were otherwise not altered.

A dispute existed for a long time between the States of New York and New Jersey respecting the boundary line between them as to property and jurisdiction. The history and circumstances of this dispute, some particulars of which are to be found in the reports of the cases of *State* v. *Babcock*, 1 Vroom, 29; *People* v. *Central Railroad Company of New Jersey*, 42 N. Y. 283; and *Hall* v. *Devoe Manufacturing Company*, 14 Fed. Rep. 183, are not material to the determination of this case, in the view we take of it, any further than to show what was the

subject-matter of the dispute.   For the purpose of having it settled, the State of New Jersey filed a bill in equity in this court against the State of New York, in February, 1829.   That bill sets forth the patent of March 12th, 1664, from Charles the Second to the Duke of York; the conveyance of lease and release by the Duke of York, of June 24th, 1664, to Lord Berkeley and Sir George Carteret, of land constituting the State of New Jersey; the division of the land, by various conveyances, into East New Jersey and West New Jersey, its settlement and the institution of proprietary governments therein, which continued until May, 1702, when the proprietors surrendered their right of government to Queen Anne; and the union of the two divisions into one province and government, under the Crown of England, which continued until July 4th, 1776. The bill sets forth that the Hudson River was, by the said grants, the dividing boundary between New Jersey and New York, and New Jersey was bounded on her eastern shores by the waters formed by the confluence of the Hudson and East rivers and also by the waters of Staten Island Sound or Kill van Kull or Arthur Kull, which sound is distinct from Hudson River or bay; that, soon after the grant to Berkeley and Carteret, the inhabitants of East New Jersey proceeded to use the waters of the Hudson and sound adjoining the New Jersey shore, for the purposes of fishing, navigation, wharfing and other purposes, and erected docks and piers at Jersey City and Hoboken, and on the shores of the Hudson, and far beyond low-water mark, without interruption from the inhabitants or public authorities of New York, and the citizens of New Jersey had always exercised full and absolute right and enjoyment over the river Hudson and the other adjoining waters to the midway or channel thereof, and also a common right of navigation and use over the whole of the river and dividing waters in common with the State of New York; that, by the fair construction of the said grants and by the principles of public law, New Jersey is entitled to the exclusive jurisdiction and property of and over the waters of the Hudson River from the 41st degree of latitude to the bay of New York, to the *filum aquæ*, or middle of the river, and to the midway or channel

of the bay of New York and the whole of Staten Island Sound, together with the land covered by the water of the river, bay and sound, in the like extent; that, while the said two States were colonies, New York became wrongfully possessed of Staten Island and the other small islands in the dividing waters between the two States; that the possession thus acquired by New York had been since acquiesced in, New York insisting that her possession of said islands had established her title; that New York has no other pretence of title to said islands but adverse possession; that, as such possession has been uniformly confined in its exercise to the fast land thereof, the title of New Jersey to the whole waters of the Staten Island Sound remains clear and absolute in New Jersey, according to the terms of said grants; that, though the people of the State of New York formerly recognized the rights and jurisdiction of New Jersey as so set forth, they had lately asserted an absolute and exclusive right of property, jurisdiction and sovereignty over all the waters of the Hudson River and bay and Staten Island Sound, and that quite up to high-water mark on the New Jersey shore, and, by late public statutes, had extended the west lines of her counties lying opposite to New Jersey, on the east side of the Hudson River, to the west bank of the river, and had enforced the said unjust pretension by enacting that penalties should be imposed on any person who should execute, or attempt to execute, civil or criminal process on any part of the dividing waters by virtue of any other authority than her own laws; that, under color of said statutes, her officers had occasionally executed process on the west side of Hudson River and on the wharves so erected on the west bank of the river, within the territory and jurisdiction of New Jersey; that New York pretends that all that part of said tract of country granted to the Duke of York, and which he did not convey to Berkeley and Carteret, remained in him, that no part of Hudson River was granted to Berkeley and Carteret, and that, when New York became an independent State, all the said domain of the Duke of York, with the Hudson River and the other dividing waters, vested in full propriety and sovereignty in New York, and that New York has always

claimed and possessed the same accordingly; that New Jersey insists, that, in the grants to Berkeley and Carteret, the equal use and property of the river Hudson and sound is expressly and in terms conveyed to them, and, accordingly, Berkeley and Carteret and their grantees and assigns before the Revolution, and New Jersey, as one of the United States, since the Revolution, had always claimed, exercised, occupied and enjoyed right, title and jurisdiction, as well over the territory as the waters of Hudson River and bay, equal in extent to those used and exercised by New York; that the citizens of New Jersey, both before and since the Revolution, under the authority, jurisdiction and control, as well of the colonial as of the State government of New Jersey, had, ever since the first settlement of the colony, used, occupied and enjoyed the territory and waters of the Hudson River and bay and Staten Island Sound, and all other dividing waters between the said States, by building and constructing docks and wharves thereon extending far below low-water mark on the westerly shores thereof, by locating and appropriating several fisheries therein, and exercising the rights of common fishery in other parts thereof, by locating and appropriating oyster grounds therein and planting them with oysters under rights derived from New Jersey, and by navigating the same with her ships and vessels, which would, at pleasure, lie at anchor in the Hudson River, bay and sound, and also by the docks and wharves so constructed under the authority and jurisdiction of New Jersey, without interruption, and by various other acts and uses; that, even though said grants may not have conveyed any right of property in said river, yet, inasmuch as no part of said river was ever granted to the colony of New York, it remained in the Duke of York until his accession to the throne of England, in 1685, when said river became re-annexed to the Crown by his accession thereto, and remained a royal river until the American Revolution, and, upon the independence of New York and New Jersey being achieved, this public navigable river became the common boundary of the two States, with a right of property and jurisdiction in each to the midway thereof; that, at the time of the said grants to the Duke of York and from him to Berkeley and

Carteret, and for many years after, the general understanding of all parties interested in the subject-matter of those grants was, that no part of the waters of the Hudson River belonged to New York, but said river, so far as respected the colony of New York, her counties and the city of New York especially, was the mere natural boundary of the said colony, in which no right of property existed or could exist; that all the ancient grants made by the Duke of York to individuals, while he remained a duke and after he became the king, or by the colonial government established by him in the State of New York, are limited to low-water mark on the east side of the Hudson River; that the first charter to the city of New York, made in 1686, gives the city boundary and assigns to it all Manhattan Island as far as low-water mark; that the colonial legislature of New York, by an act passed in 1691, revised the previous act or ordinance laying off several counties in New York, and the county boundaries fixed by the said Revised Statutes were prescribed and based upon the principle that New York had no claim to the waters on the New Jersey side of the Hudson, the city and county of New York and the counties of Westchester and Dutchess being expressly located on the east bank of the Hudson; and that New Jersey had uniformly resisted and opposed said encroachments and pretensions of New York from their first existence. The bill prays that the eastern boundary line between New Jersey and New York may be ascertained and established; that the rights of property, jurisdiction and sovereignty of New Jersey may be confirmed to the *filum aquæ* or middle of Hudson River, from the 41st degree of north latitude on said river through the whole line of the eastern shore of New Jersey, as far as said river washes and bounds New Jersey, down to the bay of New York and to the channel or midway of the said bay, and to all the waters and the land they cover lying between the New Jersey shore and Staten Island; and all other waters washing the southern shores of New Jersey within and above the Narrows; that New Jersey may be quieted in the full and free enjoyment of her property, jurisdiction and sovereignty in said waters; and that the right, title, jurisdiction and sovereignty

of New Jersey in and over tne same, as part of her public domain, may be confirmed and established by a decree of this court.

The averments made b' New Jersey in said bill show what claims she made, and wł it her understanding was as to the claims made by New York, and as to the assertion of claims theretofore by the respective States. It is alleged by the counsel for the applicant that in early colonial times the waters surrounding Staten Island were regarded as the waters of the Hudson River, and Staten Island was regarded as lying in the waters of the Hudson River; that, in the grant to Berkeley and Carteret, New Jersey was bounded on the east, partly by the main sea and partly by the Hudson River; that the same boundary was contained in the subsequent grant of East Jersey to Carteret; that, in 1682 and again in 1709, the legislature of East Jersey, by statute, bounded Bergen County, the site of the present dispute, on the bay and the Hudson River; that such legislation of New Jersey as to the boundary of Bergen County remained unchanged until 1807; that the Montgomerie charter to the city of New York, in 1730, expressed the jurisdiction of that city as extending "to low-water mark on the west side of the North River, or so far as the limits of our said province extend there;" and that the boundaries of New York were asserted by it, in its Revised Statutes of 1830, to embrace the waters of Kill van Kull to low-water mark on the New Jersey side.

The matters in dispute between the two States as to boundary being those thus set forth, the dispute was brought to a close by an agreement or compact entered into on the 16th of September, 1833, between commissioners appointed by the two States, which agreement was confirmed by the legislatures of the two States respectively. The consent of the Congress of the United States was given to said agreement, "and to each and every part and article thereof," by an act approved June 28th, 1834, ch. 126, 4 Stat. 708. That act sets forth the agreement at length. The first five articles of it, which are all that are important here, are as follows:

"ARTICLE FIRST. The boundary line between the two States

of New York and New Jersey, from a point in the middle of Hudson River, opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, of the bay of New York, of the waters between Staten Island and New Jersey, and of Raritan Bay, to the main sea; except as hereinafter otherwise particularly mentioned.

"ARTICLE SECOND. The State of New York shall retain its present jurisdiction of and over Bedlow's and Ellis's Islands; and shall also retain exclusive jurisdiction of and over the other islands lying in the waters above mentioned and now under the jurisdiction of that State.

"ARTICLE THIRD. The State of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the bay of New York; and of and over all the waters of Hudson River lying west of Manhattan Island and to the south of the mouth of Spuytenduyvel creek; and of and over the lands covered by the said waters to the low-water mark on the westerly or New Jersey side thereof; subject to the following rights of property and of jurisdiction of the State of New Jersey, that is to say:

"1. The State of New Jersey shall have the exclusive right of property in and to the land under water lying west of the middle of the bay of New York, and west of the middle of that part of the Hudson River which lies between Manhattan Island and New Jersey.

"2. The State of New Jersey shall have the exclusive jurisdiction of and over the wharves, docks and improvements, made and to be made on the shore of the said State; and of and over all vessels aground on said shore, or fastened to any such wharf or dock; except that the said vessels shall be subject to the quarantine or health laws, and laws in relation to passengers, of the State of New York, which now exist or which may hereafter be passed.

"3. The State of New Jersey shall have the exclusive right of regulating the fisheries on the westerly side of the middle of the said waters, *Provided*, That the navigation be not obstructed or hindered.

"ARTICLE FOURTH. The State of New York shall have exclusive jurisdiction of and over the waters of the Kill van Kull between Staten Island and New Jersey to the westernmost end

of Shooter's Island in respect to such quarantine laws, and laws relating to passengers, as now exist or may hereafter be passed under the authority of that State, and for executing the same; and the said State shall also have exclusive jurisdiction, for the like purposes, of and over the waters of the sound from the westernmost end of Shooter's Island to Woodbridge creek, as to all vessels bound to any port in the said State of New York.

"ARTICLE FIFTH. The State of New Jersey shall have and enjoy exclusive jurisdiction of and over all the waters of the sound between Staten Island and New Jersey lying south of Woodbridge creek, and of and over all the waters of Raritan Bay lying westward of a line drawn from the lighthouse at Prince's Bay to the mouth of Mattavan creek; subject to the following rights of property and of jurisdiction of the State of New York, that is to say:

"1. The State of New York shall have the exclusive right of property in and to the land under water lying between the middle of the said waters and Staten Island.

"2. The State of New York shall have the exclusive jurisdiction of and over the wharves, docks and improvements made and to be made on the shore of Staten Island, and of and over all vessels aground on said shore, or fastened to any such wharf or dock; except that the said vessels shall be subject to the quarantine or health laws, and laws in relation to passengers, of the State of New Jersey, which now exist or which may hereafter be passed.

"3. The State of New York shall have the exclusive right of regulating the fisheries between the shore of Staten Island and the middle of the said waters: *Provided*, That the navigation of the said waters be not obstructed or hindered."

The act of June 28th, 1834, provides that nothing contained in said agreement "shall be construed to impair or in any manner affect, any right of jurisdiction of the United States in and over the islands or waters which form the subject of the said agreement."

It is apparent, from the terms of the various provisions of the agreement, that it is an agreement settling the territorial limits and jurisdiction of the two States in respect to the waters between them, from a point in the middle of the Hudson River,

in the 41st degree of north latitude, to the sea.   The boundary line is declared to be the middle of the said river, of the bay of New York, of the waters between Staten Island and New Jersey, and of Raritan Bay, except as afterwards otherwise particularly mentioned.   What may be the effect of the exception, whether it affects the boundary line itself, or only amounts to a concession of extraterritorial jurisdiction to the one State and the other, beyond the territorial boundary, is not necessary to be decided in the present case.   For, in either view, it is clear that the waters in which the tug was lying when she was seized were in the boundaries of the State of New Jersey.   The only jurisdiction given to the State of New York, beyond the boundary line specified in Article First, over the waters of the Kill van Kull, is that specified in Article Fourth, by which it is declared that "the State of New York shall have exclusive jurisdiction of and over the waters of the Kill van Kull between Staten Island and New Jersey to the westernmost end of Shooter's Island, in respect to such quarantine laws, and laws relating to passengers, as now exist or may hereafter be passed under the authority of that State, and for executing the same."   The rest of that article relates to Staten Island sound west of Shooter's Island, and has no reference to this case.   The jurisdiction thus conceded to New York is clearly a limited one, and cannot, in any view, be regarded as altering the general boundary line; and as the tug, when seized, was on the New Jersey side of that line, she was within the State of New Jersey, not because she was fastened to a dock on the shore of New Jersey, but because she was within that part of the waters between Staten Island and New Jersey which, by Article First of the agreement, is set apart to New Jersey.

Being thus within the State of New Jersey, was the tug within the District of New Jersey and within the territorial jurisdiction of the District Court of the United States for the District of New Jersey?   We are all of the opinion that, when the act of Congress of 1789 declared that the New Jersey district should consist of the State of New Jersey, it intended that any territory, land or water, which should at any time,

with the express assent of Congress, form part of that State should form part of the District of New Jersey. By sections 530 and 531 of the Revised Statutes, the State of New Jersey constitutes a judicial district. The intention is, that the boundary of the district shall be coterminous with the boundary of the State. The same thing is true as to the Southern District of New York, and as to the district across the water at the *locus in quo,* which is the Eastern District of New York. That district was created by the act of February 25th, 1865, chap. 54, 13 Stat. 438, to consist of "the counties of Kings, Queens, Suffolk and Richmond, in the State of New York, with the waters thereof." By section 541 of the Revised Statutes, the Northern District of New York is defined as including the counties of Albany, Rensselaer, Schoharie, and Delaware, with all the counties north [and west] of them; the Eastern District as including "the counties of Richmond, Kings, Queens, and Suffolk, with the waters thereof;" and the Southern District as including "the residue of said State, with the waters thereof." It is consonant with the convenience and habits of the people, that, when any place is within the limits and jurisdiction of a State, it should not be joined to the whole or a part of another State, as to the jurisdiction of the courts of the federal government; and it is not to be presumed, in view of the terms of the statutes on the subject, and of the necessity for the consent of Congress to all compacts between the States, that such separation can be intended unless clearly expressed. Where Congress declares that such a judicial district shall consist of such a State, and afterwards the boundary of the State is so lawfully altered as to include or exclude a particular piece of territory, it is a reasonable construction to say, that the judicial district shall, *ipso facto,* without further legislation by Congress, expand or contract accordingly. When the State of Massachusetts ceded to the State of New York, in 1853, its sovereignty and jurisdiction over the district of Boston Corner, and the latter State accepted the same, and Congress consented to such cession and annexation, Act of January 3d, 1855, chap. 20, 10 Stat. 602, there was no special transfer by Congress of the annexed territory from the District of Massachusetts to the Southern District

of New York, but it fell within that district by becoming a part of Columbia County, in the State of New York.

The provision in the act of June 28th, 1834, that nothing in the agreement between New York and New Jersey shall impair "any right of jurisdiction of the United States in and over the islands or waters which form the subject of the said agreement," is well satisfied without construing it as applying to the then existing jurisdiction of any particular court of the United States. Article Second of the agreement provides that "the State of New York shall retain its present jurisdiction of and over Bedlow's and Ellis's Islands; and shall also retain exclusive jurisdiction of and over the other islands lying in the waters above mentioned and now under the jurisdiction of that State." Other articles of the agreement provide for the exclusive jurisdiction of New York or New Jersey over specified waters. In giving consent to the agreement, and "each and every part and article thereof," Congress was consenting, apparently, as against any rights of jurisdiction which the United States then had, to the exclusive jurisdictions of New York and New Jersey, respectively, over the islands and waters referred to. Hence, for abundant caution, the clause in question was added. New York had, by an act passed February 15th, 1800, 1 R. L. 189, ceded to the United States jurisdiction over "all that certain island called Bedlow's Island, bounded on all sides by the waters of the Hudson River, all that certain island called Oyster Island" (known afterwards and now as Ellis's Island), "bounded on all sides by the waters of the Hudson River," and also Governor's Island, reserving to the State the right to serve and execute, on those islands respectively, civil or criminal process issuing under the authority of the State.

Reference is made to Article Six of the amendments of the Constitution, which provides that, "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law;" and it is suggested that the boundaries of a district could not be ascertained by law, if they were left to change with such local changes as coterminous

States might agree upon with each other as to their respective
boundaries and limits.   Article Six was one of ten articles pro-
posed by the first Congress, as amendments to the Constitu-
tion, on the 25th of September, 1789, the day after the Judiciary
Act was approved, providing that the New York district should
consist of the State of New York, and the New Jersey district of
the State of New Jersey, and defining and ascertaining by law
all the other districts which it established, solely by naming
the several States as districts.   There were two disputes as to
boundary existing at that time between Massachusetts and
Rhode Island, both of them running back to colonial times, one
respecting the northern boundary of Rhode Island, and the
other respecting the eastern boundary of Rhode Island.   The
particulars of the first dispute appear in the record of a suit in
equity brought in this court by Rhode Island against Mas-
sachusetts, in 1832, 12 Pet., 657, to settle such northern
boundary.   In December, 1845, by a decree of this court, the
bill in the suit was dismissed on the merits, and the northern
boundary of Rhode Island was established on the line claimed
by Massachusetts.   In 1854 Massachusetts filed a bill in equity in
this court against Rhode Island, to settle said eastern boundary.
A conventional boundary line, different from that claimed by
either State, was agreed upon, and sanctioned by Congress, by
an act approved February 9th, 1859, chap. 28, 11 Stat. 382, and
established by a decree of this court made December 16th,
1861, to take effect March 1st, 1862.   The act of Congress de-
clared that the new line should " be taken and deemed to be,
for all purposes affecting the jurisdiction of the United States,
or of any department of the government thereof," the true line
of boundary between Massachusetts and Rhode Island.   In the
latter case, as in the present one, the boundary between the
two disputing States was settled on a line different from that
claimed by either.   The Judiciary Act defined the State as the
district, not the State as either party to the dispute claimed it
to be; and the effect of the change of State boundary in the
present case, on the limits of judicial districts, must be held to
be as potent as that in the case of Massachusetts and Rhode
Island, notwithstanding the affirmative provision in the act in

the latter case, as to the jurisdiction of the United States and of the departments of its government. Congress has always left judicial districts to be confined within State limits. Of course, the district, as a place of trial, must be ascertained by law before the crime is committed, and a person charged with a crime cannot be tried for it in a district which did not include, when the crime was committed, the place where it was committed. Whether a change in the boundary of a State, and thus of a district, after the commission of a crime, and before a trial for it, would have the effect of preventing a trial in any district, is a question which must be decided when it shall arise. The mode adopted by Congress of ascertaining districts by law, in such manner that their boundaries shall change as the boundaries of the States change, is one at least sufficient and convenient for practical purposes in all cases except where a person charged with crime and placed on trial in a particular district, may be able to establish that his rights under Article 6 of the amendments of the Constitution are being violated.

Views not in harmony with those above set forth were expressed by the District Court for the Southern District of New York in the case of *The United States* v. *The Ship Julia Lawrence*; and the case of *The L. W. Eaton*, 9 Benedict, 289. The former case was decided by Judge Betts, in 1860, and from that time forward the District Court for the Southern District of New York exercised its jurisdiction on the view that that jurisdiction was not to be governed by the provisions of the agreement between New York and New Jersey. Our attention has not been called to any case before the present one where a federal court in New Jersey has passed on the question of the limits of the District of New Jersey, as affected by that agreement. There being thus a conflict of interpretation between the judicial authorities of the two districts as to the question of the territorial jurisdiction of those districts, it is important that the effect of the agreement between the two States on that jurisdiction should be clearly defined. This we have endeavored to do. The result is, that

*The application for the writ of prohibition must be denied.*