## THE NORMA.[1]

### KIERNAN v. THE NORMA.

(*District Court, S. D. New York.* July 1, 1887.)

1. ADMIRALTY—TERRITORIAL JURISDICTION—WATERS OF HUDSON RIVER—NEW YORK AND NEW JERSEY.

    The limits of the jurisdiction of the federal Southern district of New York, and the district of New Jersey, over the waters of the Hudson river lying west of Manhattan island, are coincident with the boundaries of the jurisdiction of the states of New York and New Jersey over the same waters, as settled by the agreement between New York and New Jersey, entered into September 16, 1833, and approved by congress June 28, 1834.

2. SAME—VESSEL AT WHARF IN JERSEY CITY.

    By that agreement New Jersey retained exclusive jurisdiction over the wharves on her shore, and over all vessels fastened to such wharves. *Held*, therefore, that a vessel seized by the marshal while at a wharf in Jersey City was attached in the district of New Jersey, outside of the Southern district of New York, and a suit begun in the latter district by such attachment must fail for want of jurisdiction

*Benedict, Taft & Benedict*, for libelant.
*Hector M. Hitchings*, for claimant.

BROWN, J. The Norma was libeled in this court in 1881, and seized by the marshal, under process of this court, while she was made fast, as the proof shows, to the wharf in the Morris canal basin, Jersey City. The answer alleged that the Norma was not, at the time of seizure, within the jurisdiction of this court, but within the waters of the state of New Jersey. The answer also contained a defense upon the merits. Under various decisions, up to the time when this libel was filed, the Norma was understood to be within the jurisdiction of this court, being outside of the original low-water mark of the Hudson river on the western shore. *The L. W. Eaton*, 9 Ben. 289; *The Argo*, 7 Ben. 304; *Malony* v. *City of Milwaukee*, 1 Fed. Rep. 613. In the *Case of Devoe Manuf'g Co.*, 108 U. S. 401, 2 Sup. Ct. Rep. 894, the supreme court held that the territorial boundaries of the judicial districts should be held to expand or contract according to any change in the boundaries between the states, as lawfully altered from time to time; and that accordingly the agreement as to the boundaries between the states of New York and New Jersey, entered into on the sixteenth of September, 1833, and approved by congress, June 28, 1834, (see 4 St. at Large, 708,) became operative in determining the territorial limits of the jurisdiction of the federal courts of the two states. The court say, (pages 413, 414:) "We are all of the opinion that, when the act of congress of 1879 declared that the New Jersey district should consist of the state of New Jersey, it intended that any territory, land or *water*, which should at any time, with the express assent of congress, form part of that state, should form part of the district

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

of New Jersey." The court accordingly held that the tug in that case was within the territorial jurisdiction of New Jersey, "because she was within *that part of the waters* between Staten island and New Jersey, which by article first of the agreement was *set apart for New Jersey*." The subsequent qualification in article 4 of the agreement was held to be a limited qualification, relating solely to quarantine laws, and laws relating to passengers, not affecting the boundary "*or jurisdiction*" given to New Jersey in article 1 of the agreement. The tug seized in that case was in the western half of the Kill van Kull,—waters which, by the general boundary line of the first article, were "set apart to New Jersey;" and it was held that that locality was not affected by the subsequent exception, which gives New York jurisdiction there "in respect to quarantine laws and laws relating to passengers" only; regulations of a police character, which do not affect the boundary line, or the general *jurisdiction* of New Jersey.

Upon the principle of the foregoing decision it must be held, therefore, that if it was the intent of the agreement between the two states, which agreement did receive the express assent of congress, that the *waters of the Hudson river* opposite Manhattan island, to the westward of the middle line of the river, should form a part of the state of New York, for all the purposes of government and of judicial jurisdiction, then these waters would also form a part of the Southern district of New York, and be within its jurisdiction. If by that agreement these waters were designed to form a part of the state of New Jersey, and to be subject to its jurisdiction, then they are within the federal district of New Jersey, and outside the jurisdiction of this court.

The agreement between the states was the result of a long-pending controversy, which had been begun by the state of New Jersey nearly a half a century before, in questioning the property rights and jurisdiction of the state of New York, both in the soil and the waters of the Hudson, up to low-water mark, to the westward of the middle line of the river, which had theretofore been exercised by the state of New York, substantially unquestioned, from the earliest colonial days. The question involved then, as it does now, matters of no small practical importance in the administration of justice. If the jurisdiction of the one court or of the other were dependent upon the proof as it might finally appear upon the trial, whether the *locus* of the tort, or the crime, or the place of seizure of the vessel, were upon the one side or the other of the middle line of the Hudson river, great practical embarrassments would often arise, both in the decision of causes and in the service of process. Practically, that line is an imaginary one, incapable of definition for immediate practical application in the service of process. Wide difference in the testimony as to the situation of vessels is a familiar fact. It is important, in the practical administration of justice, that such uncertainties, impediments, and embarrassments should be as few as possible. They could not well be avoided, with such a commerce as New York possesses, except either by giving concurrent jurisdiction over the whole river to both states, and to both districts, as is done by statute,

(section 542, Rev. St.,) as to the waters of different counties, in the case of the Eastern and Southern districts of New York; or else by conferring jurisdiction over the whole river upon one state or the other exclusively; or by some compromise, partaking in some degree of both. ·

The eight different articles of the agreement between the states (see 4 St. at Large, 708) bear the most evident marks of compromise, whereby it was plainly intended to obviate these difficulties, and to secure practical results. It is in the light of these plain objects that the agreement should be interpreted.

The first article of the agreement does not declare that the boundary line between the two states shall be the middle of the river, without exception or qualification; but only, "except as hereinafter otherwise particularly mentioned." Article third particularly mentions that "the state of New York shall have and enjoy *exclusive jurisdiction* of and over all the *waters of the Hudson river* lying west of Manhattan island, and to the south of the mouth of Spuytenduyvel creek; and *of and over the lands covered by said waters, to the low-water mark*, on the westerly or New Jersey side thereof, subject to the following rights of property, and of jurisdiction of the state of New Jersey; that is to say: (1) The state of New Jersey shall have the exclusive *right of property* in and to the land under water lying west of the middle of the bay of New York, and west of the middle of that part of the Hudson river which lies between Manhattan island and New Jersey. (2) The state of New Jersey shall have the exclusive jurisdiction of and over the wharves, docks, and improvements made and to be made on the shore of said state; and of and over all vessels aground on said shore, or fastened to any such wharf or dock;" also except as to quarantine or health laws, passengers, and fisheries.

These provisions seem to me to show plainly that, as respects the land under water between the middle line of the river and the low-water mark on the western shore, except the docks and vessels fastened thereto or ashore, the state of New Jersey has nothing more than the mere right of property,—the naked legal title. She holds this as she might hold the title or exclusive right of property in any other land within the state of New York, and in the same way that any private individual might own it; that is, subject to the "exclusive jurisdiction" which article 3 of the agreement confers upon the state of New York. The *"waters"* of this part of the Hudson, moreover, are by article 3 expressly "set apart for New York" as unequivocally as the waters of the Kill van Kull, in the *Case of Devoe Manuf'g Co.*, 108 U. S. 401, 2 Sup. Ct. Rep. 894, were held to be "set apart for New Jersey."

The question should be determined with reference to practical objects, and not to mere theoretical or imaginary lines. The agreement was designed to secure practical ends to avoid practical difficulties; and, in doing so, it plainly excluded the state of New Jersey from the functions of sovereignty, legislative or judicial, over "the waters" of the Hudson below low-water mark on the western shore; and gave all functions, legislative and judicial, to the state of New York over these waters, except certain minor privileges as to fisheries reserved to the state of New

Jersey. The boundaries of a state, for practical purposes, are the boundaries that limit its sovereignty and jurisdiction.

The Revised Statutes, § 541, in defining what shall constitute the Southern district of New York, after defining the Northern and Eastern districts, says that the Southern district "includes the residue of the state, *with the waters thereof.*" These words evidently refer to all those waters that appertain to the state of New York adjacent to the counties of the Southern district, and of which the state of New York has exclusive jurisdiction. There is no similar language in reference to the district of New Jersey; nor by any reasonable implication, as it seems to me, can those waters of the Hudson river, over which, by the agreement between the states, ratified by congress, the state of New Jersey has no jurisdiction whatever, be deemed a part of the district of New Jersey. As those waters, by the express agreement of the states, and the assent of congress, "are set apart to New York," and declared to be within its "exclusive jurisdiction," they are a part of the waters of the state of New York, within the meaning of section 541, and therefore within the limits of the Southern district of New York.

The same practical reasons that led to the solution of difficulties in the administration of justice between the two states by means of the agreement of 1833, should, it seems to me, upon the principle in the *Case of Devoe Manuf'g Co.*, *supra*, be held to determine the intent of the statute as respects the limits of the jurisdictions of the Southern district of New York and the district of New Jersey, in the sense above given. Any other construction would result in reviving and perpetuating the very difficulties which this agreement, ratified by congress, was, in part at least, designed to avoid.

In the absence of any controlling authority, and until otherwise determined, I shall therefore apply the various provisions of the agreement between the states to the determination of all questions of jurisdiction as between the different federal districts. This was the solution applied in the *Case of Devoe Manuf'g Co.*, as respects the waters of the Kill van Kull.

In the present case, it is clearly shown that the Norma, when seized by the marshal, was made fast to the dock on the New Jersey shore. Although she was outside of low-water mark, she was still within the second reservation of article 3 of the agreement between the states, and she was therefore within the exclusive jurisdiction of New Jersey. The marshal had no authority, therefore, to make the seizure, and the court acquired thereby no jurisdiction of the *res*. The libel must, therefore, be dismissed upon the plea to the jurisdiction.

The plea to the merits did not waive the defense. Ben. Adm. §§ 367, 368. *The Monte A.*, 12 Fed. Rep. 331; *The Mary McCabe*, 22 Fed. Rep. 750. It is only the want of jurisdiction of the person that is cured by a general appearance. *Atkins* v. *Disintegrating Co.*, 18 Wall. 272, 298. In such cases the dismissal is without costs. *Wenberg* v. *Cargo of Mineral Phosphate*, 15 Fed. Rep. 285, 288; *Pentlarge* v. *Kirby*, 20 Fed. Rep. 898.