## THE ROSEMARY.

District Court, D. New Jersey. September 13, 1927.

**1. Customs duties ⊚⇒130(3)—Licensed pleasure yacht carrying 400 cases of whisky held subject to forfeiture as engaged in unlicensed "trade" (46 USCA §§ 103, 278; Tariff Act 1922, §§ 593, 594 [19 USCA §§ 496–498]).**

Motorboat licensed as pleasure yacht, which was seized with 400 cases of whisky on board, *held* subject to forfeiture under Rev. St. §§ 4214, 4337 (46 USCA §§ 103, 278 [Comp. St. §§ 7804, 8086]), and Tariff Act 1922, §§ 593, 594 (19 USCA §§ 496–498), as engaged in commercial activity for which it was not licensed, notwithstanding claim that boat was not liable, because not employed in any "trade"; "trade" being defined as occupation, employment, or activity.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Trade.]

**2. Customs duties ⊚⇒133(5)—Failure to allege in libel that yacht was formally seized held not fatal, where evidence showed seizure by proper authority (46 USCA §§ 103, 278; Tariff Act 1922, §§ 593, 594 [19 USCA §§ 496–498]).**

In libel under Rev. St. §§ 4214, 4337 (46 USCA §§ 103, 278 [Comp. St. §§ 7804, 8086]), and Tariff Act 1922, §§ 593, 594 (19 USCA §§ 496–498), for forfeiture of licensed pleasure yacht carrying liquor, failure to allege or prove that vessel was formally seized by collector of customs of port of New York *held* not fatal to jurisdiction of court, where uncontradicted testimony showed seizure was made by proper party.

**3. Customs duties ⊚⇒133(2)—Jurisdiction acquired by seizure of boat for engaging in unlicensed trade is not lost by failure to allege seizure in libel itself (46 USCA §§ 103, 278; Tariff Act 1922, §§ 593, 594 [19 USCA §§ 496–498]).**

Jurisdiction of court in libel against vessel under Rev. St. §§ 4214, 4337 (46 USCA §§ 103, 278 [Comp. St. §§ 7804, 8086]), and Tariff Act 1922, §§ 593, 594 (19 USCA §§ 496–498), on account of engaging in unlicensed trade, so far as seizure is concerned, is acquired when seizure is made by proper party, and jurisdiction is not subsequently surrendered because of mere failure to allege seizure in the libel itself.

**4. Admiralty ⊚⇒32—Federal court for district of New Jersey held without jurisdiction of libel against yacht seized on North River between low-water mark on New Jersey side and Manhattan Island (46 USCA §§ 103, 325; Tariff Act 1922, §§ 593, 594 [19 USCA §§ 496–498]; Act June 28, 1834 [4 Stat. 708]).**

In libel for forfeiture of pleasure yacht for engaging in unlicensed trade under Rev. St. §§ 4214, 4377 (46 USCA §§ 103, 325 [Comp. St. §§ 7804, 8132]), and Tariff Act 1922, §§ 593,

594 (19 USCA §§ 496–498), on account of yacht's carrying cargo of liquor, federal District Court for District of New Jersey *held* without jurisdiction, where yacht was seized on North River between low-water mark on New Jersey side and Manhattan Island, as such waters are within exclusive jurisdiction of state of New York, under compact between states of New York and New Jersey, approved by Congress by Act June 28, 1834 (4 Stat. 708).

Forfeiture Libel. Proceeding by the United States against the motorboat Rosemary on claim of forfeiture for violation of the customs revenue laws. Libel dismissed.

Walter G. Winne, U. S. Dist. Atty., of Hackensack, N. J., and Walter H. Bacon, Jr., Asst. U. S. Dist. Atty., of Trenton, N. J.

Louis Halle, of New York City, for claimant.

RUNYON, District Judge. The facts in this case are in little dispute. The motorboat Rosemary was licensed as a pleasure yacht, and on November 13, 1924, was seized by customs officers in the North River at a point about opposite Fifteenth street, in the city of Hoboken, N. J., having on board when seized 400 cases of Scotch whisky bearing the label "Glascow." Six men on board the vessel at the time were arrested and the vessel and cargo were delivered into the custody of the customs authorities.

While the original libel among other grounds, seeks the forfeiture of the Rosemary for alleged violation of section 4337 of the Revised Statutes (46 USCA § 278 [Comp. St. §' 8086]), sections 586 and 587 of the Tariff Act of 1922 (19 USCA §§ 488, 489), and the provisions of the National Prohibition Act (27 USCA), the government neither urges nor argues that the provisions of these statutes afford sufficient grounds for such forfeiture, basing its claims rather upon the provisions of section 4377 of the United States Revised Statutes (46 USCA § 325 [Comp. St. §' 8132]) and sections 593 and 594 of the Tariff Act of 1922 (19 USCA §§ 496–498).

Section 4377, Revised Statutes, reads as follows:

"Whenever any licensed vessel is transferred, in whole or in part, to any person who is not at the time of such transfer a citizen of and resident within the United States, or is employed in any other trade than that for which she is licensed, or is found with a forged or altered license, or one granted for any other vessel, such vessel with her tackle, apparel, and furniture, and the cargo, found on board her, shall be forfeited. But vessels which may be licensed for the mackerel fish-

ery shall not incur such forfeiture by engaging in catching cod or fish of any other description whatever."

While sections 593 and 594 of the 1922 Tariff Act are as here set forth:

"Sec. 593. Smuggling and Clandestine Importations.—(a) If any person knowingly and willfully, with intent to defraud the revenue of the United States, smuggles, or clandestinely introduces, into the United States any merchandise which should have been invoiced, or makes out or passes, or' attempts to pass, through the custom house any false, forged, or fraudulent invoice, every such person, his, her, or their aiders and abettors, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in any sum not exceeding $5,000, or imprisoned for any term of time not exceeding two years, or both, at the discretion of the court.

"(b) If any person fraudulently or knowingly imports or brings into the United States, or assists in so doing, any merchandise, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, such merchandise shall be forfeited and the offender shall be fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both. Whenever, on trial for a violation of this section, the defendant is shown to have or to have had possession of such goods, such possession shall be deemed evidence sufficient to authorize conviction, unless the defendant shall explain the possession to the satisfaction of the jury.

"Sec. 594. Seizure of Vessels and Vehicles.—Whenever a vessel, or vehicle, or the owner or master, conductor, driver, or other person in charge thereof, has become subject to a penalty for violation of the customs revenue laws of the United States, such vessel or vehicles shall be held for the payment of such penalty and may be seized and proceeded against summarily by libel to recover the same: Provided, that no vessel or vehicle used by any person as a common carrier in the transaction of business as such common carrier shall be so held or subject to seizure or forfeiture under the customs laws, unless it shall appear that the owner or master of such vessel or the conductor, driver or other person in charge of such vehicle was at the time of the alleged illegal act a consenting party or privy thereto."

[1] It is contended for the claimant that sec-

tion 4377 of the Revised Statutes is not applicable because, being licensed as a pleasure yacht, the Rosemary's license did not provide for indulgence in any trade whatever, and it could therefore not be guilty of being "employed in any other trade than that for which she is licensed"; furthermore that section 4214 of the Revised Statutes (46 USCA § 103 [Comp. St. § 7804]), which applies to gas yacht of the Rosemary's description, actually prohibits such vessels from transporting merchandise or carrying passengers for pay, and that since there was no evidence of compensation to any person for transporting the liquors aboard the vessel, this latter section had not been violated.

In the case of The Herreshoff (D. C.) 6 F.(2d) 414, a situation largely similar to the present one was disposed of by the court in the following language:

"As to the remaining charge, it is contended for the boat that the evidence does not show that she was engaged in the transportation of merchandise for pay. It is true that there is no direct evidence that such was the fact. She had on board, however, more than 400 cases of liquor and wine, and she was only taken after a running fight lasting 20 or 25 miles. It was obviously a commercial undertaking in which she was engaged. There can be no doubt that her service was paid for."

It appears equally plain to me that the carriage of this large amount of liquor on the Rosemary constituted an activity altogether commercial in its nature, and thus violative of the provisions of section 4214, quite apart from the violation of section 4377, alleged in the libel. And since the commercial transportation of merchandise, be it lawful or contraband, is in the nature of trade, I am able to read in the circumstances of this case a direct violation of the intent of section 4377, and, without any violation to the term "trade," a violation of its actual wording as well.

For, among its other meanings, "trade" is defined as "occupation, employment, or activity," and therefore if the said section in its strict sense provides that "whenever any licensed vessel * * * is employed in any other *activity* than that for which she is licensed * * * such vessel * * * shall be forfeited," it appears to me that the Rosemary has brought itself as a violator squarely within the scope of this section, and consequently is subject to forfeiture. I am also convinced, in view of the uncontradicted testimony offered in behalf of the government, that the requirements of sections 593 and 594 of the 1922 Tariff Act have been met, and that the right to forfeiture provided for in these sections has been proved.

[2, 3] The claimant contends further that the libel must be dismissed for failure to allege or prove that the vessel was formally seized by the collector of customs of the port of New York. The evidence on this point, however, and not contradicted. is that an inspector of customs made the original seizure and delivered the boat and cargo into the custody of the customs authorities. This testimony shows the seizure to have been made by a proper party, and, since that is so, I take it that in so far as authority to make a seizure is concerned, jurisdiction for the ensuing procedure was then and there acquired, and has not been surrendered since because of the mere failure to allege the same in the libel itself; for in the case relied upon by the claimant in support of this contention, U. S. v. The Frank Silvia (C. C.) 45 F. 641, the court goes no further than to say:

"There is no allegation that any seizure was made, and I understand none was in fact made. A seizure of the vessel before filing the libel is necessary to give jurisdiction. This has been settled by numerous cases."

The fact that in the present case a seizure was actually made serves to distinguish this from the Silvia Case. See, also, U. S. v. Two Automobiles and Five Cases of Whisky (D. C.) 2 F.(2d) 264.

[4] The claimant, moreover, argues that this court lacks jurisdiction because the vessel was not seized within the jurisdiction of the district of New Jersey. The testimony as to the location of the vessel is that she was in the North River at a point opposite Fifteenth street, Hoboken. The use of an ordinary street as a guide or reference fixing location is, to my mind, strongly indicative of its employment as the nearest fixed point, and consequently satisfies me that the vessel's location in the North River was nearer a New Jersey street than to any fixed point in New York, which under contrary circumstances might have been used.

Had some noted landmark been chosen by the witness to indicate approximate location, as, for instance, that the vessel was seized in the North River at a point opposite Grant's Tomb, I should have difficulty in satisfying myself as to the location of the nearer shore, but that element is lacking altogether under the present circumstances. In any event, the government's testimony stands uncontradicted.

But, granting all of the foregoing as contended for by the government, there yet re-

mains to be disposed of a portion of claimant's plea to the jurisdiction, which, to my mind, is vital and dispositive of the entire case. Well on to 100 years ago, the states of New York and New Jersey, after a long series of differences regarding their respective jurisdictions over the waters flowing between them, entered into a compact, which was later approved by ·the Legislatures of both states, and by Congress in its Act of June 28, 1834 (4 Stat. 708). Those portions of the compact which are pertinent to the present case read as follows:

"Article First. The boundary line between the two states of New York and New Jersey, from a point in the middle of Hudson river, opposite the point on the west ·shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, of the bay of New York, of the waters between Staten Island and New Jersey, and of Raritan Bay, to the main sea, except as hereinafter otherwise particularly mentioned. * * *

"Article Third. The state of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the bay of New York, and of and over all the waters of Hudson river lying west of Manhattan Island and to the south of the mouth of ,Spuytenduyvel creek, and of and over the lands covered by the said waters to the low-water mark on the westerly or New Jersey side thereof, subject to the following rights of property and of jurisdiction of the state of New Jersey, that is to say:

"1. The state of New Jersey shall have the exclusive right of property in and to the land under water lying west of the middle of the bay of New York, and west of the middle of that part of the Hudson river which lies between Manhattan Island and New Jersey."

This language is supplemented in the congressional act of approval by the provision which states that nothing contained in the states' agreement "shall be construed to impair or in any manner affect any right of jurisdiction of the United States in and over the islands or waters which form the subject of the said agreement."

By the third article of the agreement, and in language which is unequivocal, the state of New York is given "*exclusive jurisdiction* of and over all the waters of Hudson river lying west of Manhattan Island, and to the south of the mouth of Spuytenduyvil creek, and *of and over the lands covered by said waters, to the low-water mark,* on the westerly or New Jersey side thereof," subject to

New Jersey's "exclusive *right of property* in and to the land lying west of the middle of the bay of New York, and west of the middle of that part of the Hudson river which lies between Manhattan Island and New Jersey," and New Jersey's exclusive jurisdiction over wharves, docks, and improvements on her shore and over vessels aground on said shore or fastened to such wharf or dock.

"In the case of Devoe Mfg. Co., 108 U. S. 401, 2 S. Ct. 894 [27 L. Ed. 764], the Supreme Court held that the territorial boundaries of the judicial districts should be held to expand or contract according to any change in the boundaries between the states, as lawfully altered from time to time, and that accordingly the agreement as to the boundaries between the states of New York and New Jersey, entered into on the 16th of September, 1833, and approved by Congress June 28, 1834 (see 4 Stat. 708), became operative in determining the territorial limits of the jurisdiction of the federal courts of the two states. The court say (pages 413, 414 [2 S. Ct. 902]): 'We are all of the opinion that, when the act of Congress of 1879 [1 Stat. 73] declared that the New Jersey district should consist of the state of New Jersey, it intended that any territory, land or *water,* which should at any time, with the express assent of Congress, form part of that state, should form part of the district of New Jersey.' The court accordingly held that the tug in that case was within the territorial jurisdiction of New Jersey, 'because she was within *that part of the waters* between Staten Island and New Jersey, which by article first of the agreement was set apart for New Jersey.' The subsequent qualification in article 4 of the agreement was held to be a limited qualification, relating solely to quarantine laws, and laws relating to passengers, *not affecting the boundary 'or jurisdiction'* given to New Jersey in article 1 of the agreement. The tug seized in that case was in the western half of the Kill van Kull, waters which, by the general boundary line of the first article, were 'set apart to New Jersey,' and it was held that that locality was not affected by the subsequent exception, which gives New York jurisdiction there 'in respect to quarantine laws and laws relating to passengers' only, regulations of a police character, which do not affect the boundary line, or the general *jurisdiction* of New Jersey.

"Upon the principle of the foregoing decision it must be held, therefore, that if it was the intent of the agreement between the two states, which agreement did receive the express assent of Congress, that the *waters*

*of the Hudson river* opposite Manhattan Island, to the westward of the middle line of the river, should form a part of the state of New York, for all the purposes of government and of judicial jurisdiction, then these waters would also form a part of the Southern district of New York, and be within its jurisdiction. If by that agreement these waters were designed to form a part of the state of New Jersey, and to be subject to its jurisdiction, then they are within the federal district of New Jersey, and outside the jurisdiction of this court. * * * The eight different articles of the agreement between the states (see 4 Stat. 708) bear the most evident marks of compromise, whereby it was plainly intended to obviate these difficulties, and to secure practical results. It is in the light of these plain objects that the agreement should be interpreted. * * *

"These provisions seem to me to show plainly that, as respects the land under water between the middle line of the river and the low-water mark on the western shore, except the docks and vessels fastened thereto or ashore, the state of New Jersey has nothing more than the mere right of property, the naked legal title. She holds this as she might hold the title or exclusive right of property in any other land within the state of New York, and in the same way that any private individual might own it; that is, subject to the 'exclusive jurisdiction' which article 3 of the agreement confers upon the state of New York. The 'waters' of this part of the Hudson, moreover, are by article 3 expressly 'set apart for New York' as unequivocally as the waters of the Kill van Kull, in the Case of Devoe Manuf'g Co., 108 U. S. 401, 2 S. Ct. 894 [27 L. Ed. 764], were held to be 'set apart for New Jersey.'"

The Norma (D. C.) 32 F. 411, 412, 413.

From the foregoing it seems clear that within the territory described—that is, between low-water mark on the New Jersey side and Manhattan Island—all that to which New Jersey can claim exclusive jurisdiction is her bare legal title to the land under water to the middle of the Hudson, her wharves and docks, and such vessels as are aground on her shore or fastened to her docks. This leaves in New York, in addition to her jurisdiction on her own side of the river, exclusive jurisdiction of and over all the waters above such land stretching westerly from the middle of the Hudson opposite Manhattan Island to the New Jersey low-water mark. And it was, according to the government's own contention, within this area that the seizure was made. Consequently, as I view it, the suit has been improperly brought in the district of New Jersey, whereas it should have been instituted in the Southern district of New York. See, also, Devoe Manufacturing Co., Petitioner, 108 U. S. 401, 2 S. Ct. 894, 27 L. Ed. 764.

The libel is dismissed upon the plea to the jurisdiction.