UNITED STATES TRUST COMPANY OF NEW YORK, AS TRUSTEE FOR THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY CONSOLIDATED BONDS, FORTIETH AND FORTY-FIRST SERIES; ON ITS OWN BEHALF AND ON BEHALF OF ALL HOLDERS OF CONSOLIDATED BONDS OF THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF-APPELLANT-CROSS-RESPONDENT, v. THE STATE OF NEW JERSEY; BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY; AND WILLIAM F. HYLAND, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.

DANIEL M. GABY, PLAINTIFF-CROSS-APPELLANT, v. THE PORT OF NEW YORK AUTHORITY, JAMES C. KELLOGG, III, HOYT AMMIDON, GUSTAVE L. LEVY, JAMES G. HELLMUTH, ANDREW C. AXTELL, WILLIAM J. RONAN, W. PAUL STILLMAN, WALTER H. JONES, BERNARD J. LASKER, PHILIP B. HOFFMAN, AND JERRY FINKELSTEIN, COMMISSIONERS OF THE PORT OF NEW YORK AUTHORITY, AUSTIN J. TOBIN, EXECUTIVE DIRECTOR OF THE PORT OF NEW YORK AUTHORITY, AND WILLIAM T. CAHILL, GOVERNOR OF THE STATE OF NEW JERSEY, DEFENDANTS-CROSS-RESPONDENTS, AND UNITED STATES TRUST COMPANY OF NEW YORK, ETC., INTERVENOR.

Argued October 7, 1975—Decided February 25, 1976.
Appeal Dismissed June 28, 1976.
See 96 S. Ct. 3185.
Probable Jurisdiction Noted June 28, 1976.
See 96 S. Ct. 3188.

Mr. *Robert B. Meyner* and Mr. *Devereux Milburn,* of the New York bar, argued the cause for appellant-cross-respondent-intervenor United States Trust Company (*Messrs. Meyner, Landis and Verdon,* and *Messrs. Carter, Ledyard and Milburn* and *Hawkins, Delafield and Wood,* of the New York bar, attorneys; Mr. *Meyner,* Mr. *Milburn,* and Mr. *Donald J. Robinson,* of the New York bar, on the brief and of counsel).

Mr. *Murray J. Laulicht* and Mr. *Michael I. Sovern,* of the New York bar, Special Counsel to the Attorney General, argued the cause for respondents-cross-appellants State of New Jersey, Brendan T. Byrne and William F. Hyland (Mr. *William F. Hyland,* Attorney General of New Jersey, attorney; Mr. *Laulicht,* Mr. *Sovern* and Mr. *Harold Edgar,* of the New York bar, Special Counsel to the Attorney General, on the brief).

Mr. *Howard Stern* argued the cause for plaintiff-cross-appellant Daniel M. Gaby (*Messrs. Shavick, Stern, Schotz, Steiger and Croland,* attorneys; Mr. *Stern* on the brief, Mr. *Stern* and Mr. *Theodore W. Kheel* of the New York bar and *Messrs. Battle, Fowler, Stokes and Kheel* of the New York bar, of counsel).

*Mr. Francis A. Mulhern* argued the cause for cross-respondent The Port Authority of New York and New Jersey, et al. (*Mr. Mulhern,* attorney and on the brief; *Mr. Patrick J. Falvey* of the New York bar, *Mr. Joseph Lesser* of the New York bar, *Ms. Isobel E. Muirhead, Mr. Arthur P. Berg* of the New York bar, and *Mr. Vigdor D. Bernstein,* of counsel).

PER CURIAM. The judgment is affirmed, substantially for the reasons set forth in the opinion of Judge Gelman, 134 *N. J. Super.* 124 (Law Div. 1975). The observations which follow are occasioned by Justice Pashman's suggested remedy in the Gaby suit.[1]

Whatever persuasive force might be accorded the argument that as a matter of policy the Port Authority should devote more of its energies and resources to the mass transit field, the fact remains that the remedy fashioned by our Brother is neither pressed for by Gaby on this appeal nor within the powers of this Court to direct and enforce.

Gaby's class action complaint for a declaratory judgment that the 1962 Covenant was unconstitutional asked for "multifarious relief," including a request that the Port Authority be directed "to formulate and submit to the court a plan for the development of mass transit facilities within the Port District," 134 *N. J. Super.* at 131. However, the trial judge, having concluded in the *United States Trust Co.* suit that "the repeal legislation was a reasonable and hence valid exercise of the states' police power which is not prohibited by the Contract Clause of either the Federal or the State Constitution," *id.* at 197, found it unnecessary to reach the issue of the 1962 Covenant's asserted invalidity. He therefore dis-

---

[1] Justice Pashman would order the Port Authority to complete pending projects and to "formulate and present plans and suggestions for a regional mass transportation scheme to the Legislatures of New York and New Jersey * * * in an expeditious fashion and within a fixed period of time." *Post* at 288.

missed Gaby's complaint, *id.* at 198, without discussing the requested relief of a direction for development of a mass transit plan, on which issue there was neither testimony nor argument at the trial level.

In his brief filed in the Court after direct certification of his appeal, 68 *N. J.* 175 (1975), Gaby conceded his limited purpose in pursuing the appeal as being "to preserve the issue of the constitutionality of the 1962 Covenant." The point of this in turn was, as he put it, to furnish "an alternative ground for affirming the decision below."[2] Whatever issues may have been preserved by his appeal and whatever desire there may have been to present "all the issues," the fact remains that Gaby's brief raises and discusses only the validity of the ·Covenant in constitutional terms. No argument is made there for any special relief; and, understandably, the Port Authority has likewise not briefed the question at all in this Court. At oral argument the subject was adverted to only in a limited fashion.

Ordinarily, we would have no occasion to decide an issue which, while portentous in itself, has become so remote and peripheral to the central thrust of this litigation. However, inasmuch as the minority opinion raises and discusses *in extenso* this question of considerable public significance, namely, the involvement of the Port Authority in mass transit and particularly the propriety of this Court ordering as a specific remedy the submission of a plan for development of mass transit facilities, we overlook whatever infirmities may exist in the record before us, compounded by the practical disadvantage of not having the views of the parties, and proceed to address the point.

The 1921 Compact between the States of New York and New Jersey, whereby the Port Authority was created, *N. J. S. A.* 32:1-4, envisioned the adoption of a Compre· hensive Plan for the development of the port. *N. J. S. A.*

---

[2] Cross Motion for Certification of Plaintiff-Respondent, Daniel M. Gaby.

32:1–11. Direction was given to the Port Authority in the Plan itself "to proceed with the development of the port of New York in accordance with said comprehensive plan * * *." *N. J. S. A.* 32:1–33. That the Authority's involvement in transportation matters was contemplated is obvious from a reading of this and other portions of the Comprehensive Plan as well as of the Compact; but it requires a quantum leap to derive therefrom a mandate (as distinguished from the power) to develop a plan for a particular kind or method of transportation, to wit, mass transit. It is not without significance, for instance, that the legislature has provided that the Authority *may* make recommendations for the increase and improvement of transportation facilities, *N. J. S. A.* 32:1–13, which by definition includes railroads and any facility for the "transportation or carriage of persons or property," *N. J. S. A.* 32:1–23; but nowhere is it mandated that such recommendations be made. A mandate such as that contemplated by the minority opinion is not something to be inferred by the courts but rather is a singularly appropriate subject for specific legislative directive, conspicuously absent here. *Cf. Del. Riv. & Bay Auth. v. N. J. Pub. Emp. Rel. Comm'n.,* 112 *N. J. Super.* 160, 165 (App. Div. 1970), aff'd o. b., 58 *N. J.* 388 (1971).

If, then, the Authority is in the position of being empowered (as we acknowledge) rather than mandated to act in the area of mass transit, its exercise of that power becomes a matter of discretion and judgment. As is made abundantly clear by the voluminous record in this case, the trial court's opinion, and the concurring and partially dissenting opinion here, the Authority has more than once in recent years broached the question of whether it should pursue a policy of encouraging mass transit and has determined that it shall not. The remedy suggested in the minority opinion is designed to overrule that decision. As such it is in the nature of the former prerogative writ of *mandamus,* now invocable under proceedings for relief in lieu of prerogative writs, *Rule* 4:69.

■■ However, *mandamus* will not lie if the duty to act is a discretionary one and the discretion has been exercised. As Justice Heher explained, in *Switz v. Middletown Twp.*, 23 *N. J.* 580 (1957), *mandamus* is "a coercive process that commands the performance of a specific ministerial act or duty, or compels the exercise of a discretionary function, but does not seek to interfere with or control the mode and manner of its exercise or to influence or direct a particular result." 23 *N. J.* at 587. As we have sought to demonstrate, the circumstances before us do not at all invite or accommodate the remedy proposed. This is so because the Authority (whose function is clearly not ministerial) has in fact exercised its discretion, even though that exercise has resulted in the rejection of a policy favoring mass transportation. Being a judgment decision its wisdom may be open to dispute; but as to the propriety of this Court's refusal to intrude on the underlying policy determination, there can be no question in the circumstances before us. And this not as a response to some procedural deficiency but because of our respect for the fundamental substantive principle embodied in *mandamus*.

Finally, we observe that in this particular area of bi-state operations, there is close and continuing supervision of the Port Authority by the other branches of government. Hence, the proposed remedy would not only tend to usurp the influence over the Authority vested in the Governors of the States of New York and New Jersey, but would also intrude upon the functions of the legislatures of the respective States, whose task it is in the final analysis to enact appropriate legislation and take such other action as may be required to remedy whatever deficiencies may exist with respect to mass transit.

Affirmed.

PASHMAN, J. (concurring in part and dissenting in part).

I

## INTRODUCTION TO GABY COMPLAINT

My Brothers today affirm a lower court decision which was the product of two separate and distinct actions consolidated for trial. *United States Trust Co. v. State*, 134 *N. J. Super.* 124 (Law Div. 1975). In the first action, brought by plaintiff United States Trust Company, the trial court sustained the State's repeal of the 1962 statutory covenant (*N. J. S. A.* 32:1–35.55) between the States of New Jersey and New York and the holders of bonds issued by the Port Authority of New York and New Jersey (Port Authority). That covenant was concurrently enacted by the legislatures of New York and New Jersey at the time of the Port Authority's acquisition of the Hudson & Manhattan Railroad Company (H & M), since renamed the Port Authority Trans-Hudson System (PATH). Intended as a means of protecting the bondholders' investments, the covenant prohibited the states and the Port Authority from applying "any of the rentals, tolls, fares, fees, charges, revenues or reserves, . . . for any railroad purposes whatsoever other than permitted purposes." *N. J. S. A.* 32:1–35.55. As subsequently defined in the covenant, "permitted purposes" precluded the establishment, acquisition or construction of any railroad facility until the Port Authority could determine that the facility would be self-supporting or would not produce deficits except within narrowly defined limits.

In dismissing plaintiff's cause of action, the trial court found that the 1974 "repealer," *N. J. S. A.* 32:1–35.55a, was immune from constitutional challenge as an impairment of contractual obligation, a right which is protected by *U. S. Const.*, Art. I, § X and *N. J. Const.* (1947), Art. IV, § VII, ¶ 3. As a collateral finding, the court determined that the attractiveness of Port Authority bonds was not contingent upon the continued protection of the 1962 covenant, but rather upon the viability of the Port Authority itself.

The majority affirms the trial court on these bases and to this extent, I concur fully and completely with the conclusions reached by Judge Gelman in his very enlightened and comprehensive opinion. My agreement is premised on the unduly restrictive influence which the covenant exerted on Port Authority operations in contravention of the statutory mandates upon which that agency was created in 1921. The paralytic effect of the covenant could be seen in the Authority's practical inability and attitudinal reluctance to respond to the mounting needs for rapid transit in the New York metropolitan area. In light of the limited utility which it continued to serve, the 1962 covenant represented an artificial obstacle to the affirmative public action which was necessitated as an alternative to continued and wasteful reliance solely on the private automobile as the primary mode of transportation.

The second action, *Gaby v. Port of New York Authority, et al.,* was likewise concerned with the repeal of the 1962 covenant. Expanded into a class action on behalf of citizens, residents and taxpayers whose occupations are dependent upon the existence of mass transportation, plaintiff cites the 1962 covenant as an impediment to the improvement and expansion of these facilities. While the State of New Jersey sought the repeal of the covenant as an ultimate end in the *United States Trust Co.* action, plaintiff Gaby visualizes a repeal as merely a means to a larger end. This is because the vindication of Gaby's interests is only partially dependent on freeing the financial resources from the restrictions of the 1962 covenant and placing them at the Port Authority's disposal. More problematical and essential to the relief which he desires is the necessity to overcome the administrative inertia which has characterized the agency's efforts in the area of mass transportation. Consequently, Gaby requested in his complaint that the trial court:

. . . [D]irect and order the Port Authority, its Commissioners, and its Executive Director to formulate and submit to this Court, or a Special Master to be appointed by this Court, a plan for the

development of mass transportation facilities in the Port District. . . . [Plaintiff Gaby's complaint at 17]

This action was pretried on February 22, 1973 and oral arguments were heard on September 26, 1973 on the parties' respective motions for summary judgment. Judgment was · deferred and arguments were later rescheduled to permit the submission of briefs on additional issues and the intervention of United States Trust Company as a party defendant representing the interests of Port Authority bondholders. Prior to these arguments, the pendency of legislation repealing the covenant recommended that the trial court withhold further review. Accordingly, the proceedings were stayed to permit consideration of the anticipated legislation.

The statutory repealer which was signed into law by Governor Brendan T. Byrne on April 30, 1974 precipitated the *United States Trust Co.* action, which was instituted on the same day. On the basis of common subject matter, this later action was consolidated on December 10, 1974 with the previously filed *Gaby* case by order of the trial court. These matters then proceeded to trial in February 1975.

The trial was largely confined to the factual issues of bondholder reliance on the 1962 covenant and resultant damage to the secondary bond market caused by the repeal of the covenant. The information which was thus elicited formed the basis for the trial court's reported opinion, 134 *N. J. Super.* 124, in which the constitutionality of the 1974 repealer was sustained. Although reasons upon which the court's decision was grounded were clearly distinguishable from the constitutional arguments advanced by Gaby, the court's ultimate decision — the rejection of the 1962 covenant — coincided with Gaby's interests. Regardless of whether that result was achieved by sustaining the 1974 repealer as the trial court did, or whether it was achieved by finding the 1962 covenant itself unconstitutional as suggested by Gaby, the result indicated the possibility of granting the further relief sought by Gaby. A more activist role

for the Port Authority appeared to be a reality. Nonetheless, the court concurrently ordered the dismissal of Gaby's complaint, thus frustrating the additional relief which he sought. 134 *N. J. Super.* at 198. From this disposition, Gaby filed a cross-motion for direct certification which was granted on May 28, 1975. 68 *N. J.* 175 (1975).

Similar to his presentation before the trial court, Gaby's arguments are again directed towards a declaration of the unconstitutionality of the 1962 covenant. This is more the result of strategic considerations, however, than devotion to substantive principle. Recognizing the limited nature of the trial court's factual findings and disposition, Gaby has taken what appears to be a most advisable legal course. By preserving the issue of the constitutionality of the 1962 covenant on appeal, he has simultaneously preserved one of his major contentions should this or any other court reverse the trial court on the constitutionality of the 1974 repealer.

Furthermore, in his Supreme Court brief, Gaby explained that his contentions with regard to the 1962 Covenant are inextricably tied to his request for greater involvement of the Port Authority in mass transit projects:

The Appellant's Brief of Gaby is concerned with the validity of the 1962 Covenant (*N. J. S. A.* 32:1–35.50 *et seq.*). Central to the issue of the validity of the Covenant is the question whether the mass transportation of people within the Port District was one of the principal activities authorized by the Compact (*N. J. S. A.* 32:1–35.50 et seq.) ; whether the insulation of the Port Authority from that activity was in such derogation of the Compact as to frustrate its meaning and intent and so material as to require Congressional approval. [Plaintiff-Cross Appellant's brief at 3].

The majority today chooses to overlook this relationship in its reluctance to transcend the judgmental confines of the trial court and in its affirmation of that court's dismissal of Gaby's complaint. This disposition, undertaken in an unusually cavalier fashion, is not a product of some misunderstanding as to the essential relief which Gaby requests. On the contrary, the majority recognizes the strategic con-

siderations implicit in Gaby's desire to preserve the issue of the constitutionality of the 1962 Covenant. *Ante* at 261. Nonetheless, in characterizing the constitutional arguments raised by Gaby as exemplifying a "limited purpose in pursuing the appeal," the majority misconstrues and frustrates the true interests of Gaby, and has done so in a manner which I find most distressing.

The majority justifies its truncated consideration of Gaby's plea by referring to an isolated phrase, taken out of context from a sentence which Gaby adopted as representative of his position in his cross-motion for certification. When more appropriately considered within the sentence in which it originally appeared, the phrase — "an alternative ground for affirming the decision below" — assumes an entirely different meaning from that which the majority attaches to it:

> The purposes of this cross motion are identical with those stated by the State of New Jersey in its cross motion for certification: ". . . bring before the Supreme Court *all of the issues submitted to Judge Gelman* and to avoid the possibility that some of the issues submitted to Judge Gelman might have to be determined in the first instance by the Appellate Division. Because of the urgency and public importance of this case, it would be most unwise to require a piecemeal, appellate process, particularly since the [first] issue presented by this cross motion could be an alternative ground for affirming the decision below. . . ." [Plaintiff-cross appellant's appendix at 47a–48a; emphasis supplied].

While the "first issue" refers to the constitutionality of the 1962 covenant, I believe it would be wrong to confuse Gaby's real interest in stimulating improvement of urban mass transportation with his more temporal interest in having the 1962 covenant declared unconstitutional. The majority not only fails to make this distinction, but fails to do so despite Gaby's expressed desire to present "all of the issues" to this Court.

This failure is only compounded by the majority's persistent willingness to ignore the Gaby complaint and the relief which it warrants. In spite of plaintiff's overindulgent concern for the constitutionality issue, the statement of his case reflects

more than a limited and perfunctory reference to the subject. During the course of oral argument, counsel for Gaby specifically stated:

Yes, as we read the compact between the states, the affirmative obligation of the Port Authority in this area is to plan. The immediate affirmative obligation . . . and indeed in these briefs and elsewhere, there is a suggestion that if the Covenant is invalid or the repealer upheld, either way, that it would be appropriate for the Court to direct the Port Authority to study mass transit needs in the Port Authority area and make proper proposals. Then when it comes to implementation, then you're talking about legislation of the two states, but the affirmative obligation of the Port Authority is to study the problem as it affects the Port area.

It should be noted in passing, that this statement not only affirms the relief desired by plaintiff, but also embodies a request for a remedy which parallels that which I suggest below, *infra* at 287–288.

Therefore, although my Brothers remove the constricting fiscal shackles of the 1962 covenant, they fail to take the additional steps which flow as natural concomitants to the action which they affirm. This failure, as I see it, stems, in part, from a reluctance to go farther and faster in an area plagued by administrative inaction and intransigence. It also constitutes an indulgence in the meaningless gesture of sustaining the 1974 repealer without concurrently authorizing the relief needed to implement the initiative which the Legislature sought to instill in the Port Authority by that repeal.

As I fear, the administrative foot-dragging which was implicit in the 1962 covenant, may be only symptomatic of the inertia which has characterized the Port Authority in the field of mass transit operations. The majority's decision can only serve to perpetuate this sad state of affairs.

In light of the rapidly deteriorating condition of mass transit operations in the metropolitan area, this disposition is most unfortunate. Faced with the ever-increasing deficits which are inherent in this mode of public transportation, mass transit operations have been repeatedly shunned by the Port

Authority in spite of its statutory mandate to the contrary. As cutbacks in service have been experienced throughout the Port District, the commuters' resort to the private automobile has produced a dysfunctional volume of traffic congestion and pollution. The toll which this congestion has exacted has been obvious in the tunnels and on the bridges, whose operations the Port Authority apparently prefers to maintain.

Unlike today's majority, I am unwilling to assign plaintiff Gaby's case to death or to a peaceful somnambulism. This is particularly so where within the historical and evidential materials presented to the trial court reside the seeds for a more sweeping and effective disposition. I cannot sanction the mere repeal of the 1962 covenant without a concurrent assurance that the Port Authority will assume those responsibilities for which it was created and, which to this point, it has effectively avoided. The recalcitrance of the Port Authority has not been altered by the trial court's disposition and will not be altered by merely affirming that decision. A more effective disposition is needed.

## II

## *HISTORY OF THE OBLIGATION OF THE PORT AUTHORITY TO PROVIDE MASS TRANSIT FACILITIES*

In its opinion, the majority grudgingly acknowledges the Port Authority's obligation to become involved in mass transportation. After a perfunctory reading of the statutory framework of the Port Authority, the majority concludes that the existence of such a mandate is "a singularly appropriate subject for specific legislative directive, conspicuously absent here." Ante at 258.

While specific statutory directives have served as vehicles for recent Port Authority projects, *N. J. S. A.* 32:1–35.20 (authorization for the Port Authority to undertake mass transportation projects to link the various airports in the Port District), *N. J. S. A.* 32:1–35.21 (authorization to

build railroad lines to and facilities at the various airports in the Port District), its employment is in its infancy and affords no insight as to the previously reluctant forays which the Port Authority has made into the field of mass transportation. A full consideration of the statutory basis of the Port Authority and the history of its implementation reveals that the majority's interpretation of the Authority's powers and obligations is both short-sighted and erroneous. For instance, the statutory creation of the Port Authority evinces a clear legislative intent to have the Authority become involved in development of mass transportation. The majority position misconceives the role of the Authority to be a drone-like entity ultimately dependent upon enabling legislation, rather than a separate bi-state agency. Similarly, the majority fails to recognize the inherent limitations on the knowledge, information and expertise which are at the disposal of the New Jersey and New York Legislatures on the subject of mass transit operations. In light of this fact, the wisdom of relying upon legislative directives to address the panoply of needs within the field of mass transportation becomes problematical. The failure of the majority to account for these factors casts a large shadow upon the validity of its construction of the Port Authority's powers. These inadequacies within the majority position become apparent upon thorough consideration of the statutory origins of the Port Authority and the mandate which was encompassed in its original Compact and Comprehensive Plan.

### A. Origins and Early Development; Compact and Comprehensive Plan

The Port Authority is a statutory product of a compact which was entered into by the States of New Jersey and New York in 1921.[1] Modeled after the recommendations of a joint

---

[1]New Jersey approved the compact by *L.* 1921, *c.* 151, now contained in *N. J. S. A.* 32:1-1 *et seq.* The comparable New York

commission,[2] the Port Authority represented a response to the dysfunctional competition and commercial disputes which historically had plagued the two states.[3] As such, it was intended to meet the needs and interests which the two states shared with respect to the Port of New York. This was expressly recognized in the preamble to the 1921 Compact, which stated:

> The future development of such terminal, transportation and other facilities of commerce will require the expenditure of large sums

legislation was adopted in *Laws of New York* 1921, c. 154, now contained in *N. Y. Unconsol. Laws*, § 6401 *et seq.* (McKinney 1961). Congressional consent to the compact was granted by *Pub. Res. No.* 17, *S. J. Res.* 88, c. 77, 42 Stat. 174.

At the time of creation, the agency was designated "The Port of New York Authority." *N. J. S. A.* 32:1–4. This was amended by *L.* 1972, c. 69, §§ 1, 2, contained in *N. J. S. A.* 32:1–4 and 32:1–4.1, to the more ecumenical "The Port Authority of New York and New Jersey." For the purposes of this opinion, the agency shall be referred to as the Port Authority or just Authority.

[2]The New York, New Jersey Port and Harbor Development Commission was a body whose representative membership were created by independent, though concurrently enacted bills which were passed by the Legislatures of New Jersey and New York in 1917. Composed of three commissioners from each state, the commission issued a preliminary report in 1918, New York, New Jersey Port and Harbor Development Comm'n, *Preliminary Joint Report, Transmitted to the Legislature*, February 18, 1918 (1918). This was followed by a progress report in 1919, and a comprehensive report in 1920, in which the commission proposed the establishment of a permanent body with interstate jurisdiction. *Joint Report with Comprehensive Plan and Recommendations* (1920). It subsequently submitted the tentative draft of the proposed compact. See *Bard, The Port of New York Authority*, 24–34 (1942).

[3]The enmity between the two states traces its roots as far back as the seminal case, *Gibbons v. Ogden*, 22 *U. S.* (9 Wheat.) 1, 6 *L. Ed.* 23 (1824). Although it has from time to time received exhaustive consideration in the case law, *New Jersey v. New York*, 28 *U. S.* (3 Pet.) 461, 7 *L. Ed.* 741 (1830); 30 *U. S.* (5 Pet.) 284, 8 *L. Ed.* 127 (1831); 31 *U. S.* (6 Pet.) 323, 8 *L. Ed.* 414 (1832); *In the Matter of Devoe Mfg. Co.*, 108 *U. S.* 401, 406–10, 2 *S. Ct.* 894, 27 *L. Ed.* 764 (1883); *State v. Babcock*, 30 *N. J. L.* 29 (Sup. Ct. 1862); *Central RR. of N. J. v. Jersey City*, 70 *N. J. L.* 81 (Sup. Ct. 1903), a concise presentation of its history may be found in *Bard, supra*, footnote 2, at 5–24.

of money, and the cordial co-operation of the states of New York and New Jersey in the encouragement of the investment of capital, and in the formulation and execution of the necessary physical plans. . . . [*N. J. S. A.* 32:1–1]

While the Compact delineated the framework for the Port Authority and its operations, the necessity for a more specific implementation was recognized in Article X, which directed the state legislatures to adopt "a plan or plans for the comprehensive development of the port of New York" "as soon as may be practicable." *N. J. S. A.* 32:1–11. The formulation of this plan was undertaken by the Authority's initial board of commissioners, whose *Report with Plan for the Comprehensive Development of the Port of New York, December 21, 1921* (1921) was eventually enacted as the Comprehensive Plan mandated by the Compact.[4]

This plan envisioned an active and affirmative role for the Port Authority in the development of the Port District.[5] Section 8 of the Comprehensive Plan provided:

The Port of New York Authority is hereby *authorized and directed to proceed with the development of the port of New York* in accordance with said comprehensive plan as rapidly as may be economically practicable and is hereby vested with all necessary and appropriate powers not inconsistent with the constitution of the United States or of either state, to effectuate the same, except the power to levy taxes or assessments. [*N. J. S. A.* 32:1–33; emphasis supplied]

That fulfillment of this statutory mandate contemplated the involvement of the Port Authority in transportation matters of the Port District is undeniable. This responsibility, for

---

[4]The Comprehensive Plan was enacted in *L.* 1922, c. 9, now contained in *N. J. S. A.* 32:1–25 *et seq.* New York approved the Comprehensive Plan in *Laws of New York* 1922, c. 43, now found in *N. Y. Unconsol. Laws* § 6451–68 (McKinney (1961)). Congressional consent was secured in *S. J. Res.* of July 1, 1922, c. 277, 42 Stat. 822.

[5]The metes and bounds of the Port District are defined in *N. J. S. A.* 32:1–3.

example, was explicitly mentioned in that portion of the preamble of the Compact cited above. Article XXII of the Compact further clarifies this responsibility by defining "transportation facility" as including:

> . . . *railroads*, steam or electric, motor truck or other street or highway vehicles, tunnels, bridges, boats, ferries, carfloats, lighters, tugs, floating elevators, barges, scows or harbor craft of any kind, aircraft suitable for harbor service, and every kind of transportation facility now in use or hereafter designed for use for the *transportation or carriage of persons or property*. [*N. J. S. A.* 32:1–23; emphasis supplied]

The centrality of the railroads to the organizational and coordination schemes of the Port Authority was highlighted by the separate definition of "railroads."[6] This was a reflection of the final report by the New York, New Jersey Port and Harbor Development Commission, which in 1920 had recommended the establishment of a bi-state agency with appropriate jurisdiction. See footnote 2, *supra*. The report, whose factual findings served as the basis for the Compact and the Comprehensive Plan, found the commercial inadequacies of the metropolitan area to be "primarily a railroad problem." The absence of railroad coordination and accessibility at many places within the district consequently required "essentially a railroad plan." The Commission summarized its suggestions in a proposal which entailed the establishment of railroad belt-line systems between New Jersey and New York, and concluded:

> This remodeled terminal railroad system, bringing every railroad of the Port to every part of the Port, and thus giving every part of the Port opportunity to develop and to have the economical trans-

---

6 *N. J. S. A.* 32:1–23 provides:

"Railroads" shall include railways, extensions thereof, tunnels, subways, bridges, elevated structures, tracks, poles, wires, conduits, powerhouses, substations, lines for the transmission of power, car barns, shops, yards, sidings, turnouts, switches, stations and approaches thereto, cars and motive equipment.

portation service needed for its commercial and industrial growth and expansion, constitutes the comprehensive plan of the Commission — the plan which the Commission recommends for formal adoption by the two states. [New York, New Jersey Port and Harbor Development Commission, *Joint Report, supra* footnote 2, at 3]

This statutory responsibility to develop the transportation facilities of the Port District, and particularly facilities relating to railroad operations, contained an implicit obligation to foster passenger transportation service. Although the Port and Development Commission report concentrated on the freight shipment needs of the area, it did not preclude a comparable role for the Port Authority in passenger service. With one notable exception, the Port Authority's role in passenger service is confirmed by the early history of the agency. In this regard, however, even that exception, the 1928 veto message of Governor Alfred E. Smith of New York which rejected a New Jersey proposal for the development of a rapid transit system between the states, may be no more than a personal predilection. [7] See 134 *N. J. Super.* at 149. Noting that the Port Authority should "stick to this program . . .[for] the solution of the great freight distribution problem," Governor Smith at no time denied the agency's power to deal with passenger service, and only suggested a reordering of its priorities. More importantly, the position which he advocated was expressly repudiated by the Port Authority that same year. In a June 11, 1928 resolution supporting the continuation of a Suburban Transit Engi-

---

[7]Governor Smith, in what remains the only major statement questioning a Port Authority role in passenger traffic, remarked:

I am satisfied that the Port Authority should stick to this program, and I am entirely unwilling to give my approval to any measure which at the expense of the solution of the great freight distribution problem will set the Port Authority off on an entirely new line of problem connected with the solution of the suburban passenger problem.

Veto Message, *Public Papers of Governor Alfred E. Smith of 1928*, 187–88 (1938).

neering Board,[8] the Port Authority recognized that it had a responsibility to the metropolitan commuter, based on its broader duty to develop transportation in the Port District:

> The Commissioners of the Port Authority have found in their studies that no adequate or effective interstate transportation development can take place without taking full account of *transportation of passengers* as well as of freight throughout the Port District.[9] [Emphasis supplied]

> B. *Port Authority Involvement in the Area of Mass Transit; Reports, Studies and Legislation Concerning Mass Transit*

The continuance of its role in mass transportation has been reaffirmed by the Port Authority from time to time. The obligation to provide for passenger service within the

---

[8] The Suburban Transit Engineering Board had been created in response to a Port Authority suggestion in its 1927 Annual Report. As that report stated:

> It is our opinion that, in the long run, the greatest progress will be attained by having this Engineering Board undertake the responsibility for the preparation of the engineering section of a comprehensive suburban transit plan for the entire port district. The Port of New York Authority, *Annual Report for 1927*, 56 (Jan. 20, 1928).

Parenthetically, it should be noted that this body was the intended recipient of the funds which Governor Smith vetoed. The Port of New York Authority, *Annual Report for 1928*, 63 (Dec. 31, 1928).

[9] *Annual Report for 1928, supra* footnote 8, at 64–66. The Port Authority answered more directly the fears expressed by Governor Smith in a subsequent part of its June 11, 1928 resolution:

> The Commissioners of the Port Authority are satisfied from the reports of their staff that continuance of the work of the Suburban Transit Engineering Board and the participation therein by members of the staff of The Port of New York Authority will not at this time divert any of their efforts away from the effectuation of the statutory Comprehensive Plan nor from their duties in the field of protecting the Port nor from any other pending work of the Port Authority, but on the contrary, the continuance of such Suburban Transit Engineering Board's work will facilitate the other work of the Port Authority. [*Id.* at 65]

Compact's injunction to the Post Authority has not only been acknowledged by those whose occupations and interests are related to the transportation field,[10] but by ranking members of the Port Authority staff as well. For example, the following colloquy between Assemblyman J. Edward Crabiel and the Port Authority's then Executive Director Austin J. Tobin occurred at a 1958 legislative hearing:

> ASSEMBLYMAN CRABIEL: Mr. Tobin, just to clear my mind on certain key points — I have been reading your report and listening to your talk — there is no question that, as far as the compact between the two states is concerned, *the Legislatures could direct the Port Authority to do rapid transit and that that would be within their compact.*
> MR. TOBIN: *Yes sir. There's no question about it.* [*Hearings on Assembly Bills No. 16 and 115 and Senate Bill No. 50, supra* footnote 10, Nov. 24, 1958, at 44] (emphasis supplied).

The manifestations of this responsibility have been insignificant such as the separate sections which the Authority devoted to "Suburban Transit" in its earlier Annual Reports (a practice by the way, which has been resumed since the Port Authority's acquisition of the H & M railroad in 1962). See T. W. Kheel & R. J. Kheel, "The Port Authority 1962 Covenant — Bar to Mass Transportation," 27 *Rutgers L. Rev.* 1, 5( 1973) ; The Port of New York Authority, *Annual Report for 1923,* "Commuter Passenger Traffic," 35–36 (Jan. 19, 1924) ; *Annual Report for 1924,* "Congestion of Passenger-Traffic," 23–24 (Jan. 24, 1925) ; *Annual Report for 1929,* "Suburban Transit," 27–28 (Dec. 31, 1930). More indicative, however, of the Port Authority's

---

[10]See *Hearings on Assembly Bills No. 16 and 115 and Senate Bill No. 50 before N. J. Assembly Comm. on Fed. & Interst. Rels. and Assembly Comm. on Highways, Transp. and Pub. Utilities,* Nov. 24, 1958, at 18A (Statement of Augustus S. Dreier, Counsel, Inter-Municipal Group for Better Rail Service) ; Dec. 3, 1958, at 22–A (Statement of Herman T. Stichman, Trustee, Hudson & Manhattan Railroad) (hereinafter referred to as Assembly Hearings) ; *Caro, The Power Broker. Robert Moses and The Fall of New York,* 922–23 (1974).

role in rapid transit operations have been the infrequent reports which it has issued on this subject.[11] The representativeness of at least 14 of these reports cannot be premised on any successful projects which they have stimulated or realized. As frankly admitted by Edward J. O'Mara, a chairman of the Metropolitan Rapid Transit Commission (a Port Authority-funded investigative agency which itself produced an unsuccessful series of legislative proposals):

> For at least 35 years, there has been a growing public awareness of the importance of mass transportation in the metropolitan region in the State of New Jersey. At least 14 more or less extensive studies have been made of the problem by various committees and commissions. Nothing has ever come of them, and in the meantime the problem has been becoming progressively more acute. [*Assembly Hearings*, Nov. 24, 1958, at 70A]

See also *2d Hearing before N. J. Sen. Comm'n (Created un-*

---

[11]These reports have been conducted on a variety of topics and in conjunction with various other interested organizations. Some, though by no means all, of these studies have included a continuing study begun in 1927 of the suburban transit facilities to relieve traffic congestion in conjunction with a variety of other groups (pursuant to New Jersey legislative authorization, *L.* 1927, *c.* 277); a 1937 study entitled "Suburban Transit for Northern New Jersey (Mar. 1, 1937) concerning interstate and suburban passenger problems within the Port District and New Jersey in particular (undertaken pursuant to *L.* 1936, *c. J. Res.* No. 6); a continuation of studies begun in 1937 and the presentation of legislative proposals for implementing a new transit system (pursuant to *L.* 1938, *c. J. Res.* No. 1); a 1948 study concerning the development of a rapid transit system in Northern New Jersey which would link Newark Airport and New York City (undertaken pursuant to a request by New Jersey Governor Alfred E. Driscoll); 1948 study concerning the development of a north-south transit line in Hudson County (initiated at the request of the City of Bayonne); and the creation in 1952 of the Metropolitan Rapid Transit Commission to undertake a comprehensive study of the transit problems of the Port District (*L.* 1952, *c.* 194). By agreement reached in 1955, the Port Authority provided $800,000 when this last study was inaugurated. The Commission's report was released in 1958. In addition, the Port Authority in the early 1960's conducted a series of studies concerning the feasibility of its acquiring the operations of the H & M railroad, and later, the conditions under which the authority would do so.

*der Sen. Res. No. 7 (1960) and Reconstituted under Sen. Res. No. 7 (1961)) to Study the Financial Structure and Operations of The Port of New York Authority,* Jan. 27, 1961 (2d day), at 64–66 (Statement of Austin J. Tobin, Executive Director, Port of New York Authority). In this respect, these studies provide a broad overview of the historic approach of the Port Authority to the problems of urban mass transit. This background is particularly important because what the Court is truly asked to consider is the manner in which the Port Authority has dealt with the problems of mass transit in the Port District, and the attitudinal reluctance which has characterized its efforts in this area of transportation.

These studies, in conjunction with the annual reports which are issued by the Port Authority, possess several characteristics worth noting. First, virtually none of the studies resulted from the Port Authority's own initiative. Most of the studies were the product of either legislative or other governmental requests for pertinent information and proposals. See footnote 11, *supra.* While the failure to take affirmative administrative or investigatory action may not necessarily be indicative of an agency's abdication of responsibility in the case of the Port Authority, the failing is particularly suspect. This is because the duties expressly imposed on the Port Authority by the 1921 Compact were those to "make plans for the development of said district, supplementary to or amendatory of any plan theretofore adopted;"[12] and to suggest to the state legislatures recommended means to improve Port commerce.[13]

---

[12]*N. J. S. A.* 32:1–12, which was contained in the original Compact as Article XI and which is indicative of a statutory mandate, provides:

The port authority *shall* from time to time make plans for the development of said district, supplementary to or amendatory of any plan theretofore adopted, and when such plans are duly approved by the legislatures of the two states, they shall be binding upon both states with the same force and effect as if incorporated in this agreement. [Emphasis supplied]

[13]*N. J. S. A.* 32:1–13 provides:

The port authority may from time to time make recommendations to the legislatures of the two states or to the congress of the

Second, none of these studies contains an expressed commitment (much less a recommendation of such a commitment) by the Port Authority to undertake the construction or implementation of a mass transit system. Instead, most of them recommend the assumption of these obligations by other governmental or quasi-governmental bodies and agencies. See The Port of New York Authority, *Suburban Transit for Northern New Jersey,* 10 (1937); The Port of New York Authority, *Annual Report for 1958,* 38–42. In conjunction with this, it should be noted that the Authority was one of the staunchest supporters of two New Jersey legislative proposals, S–50 and A–115, which were introduced and discussed in 1958. See *Assembly Hearings, supra,* Nov. 24, 1958, at 44, 49 (Statements of Austin J. Tobin, Executive Director, Port of New York Authority). Not surprisingly both of these measures presented plans for the establishment of an independent agency to handle matters relating to mass transportation. Conversely, the Port Authority was strongly opposed to a companion proposal, A–16, which would have authorized the agency itself to develop, improve and coordinate the rapid transit facilities in the Port District. *Assembly Hearings, supra,* Nov. 24, 1958, at 18–19 (Statements of Austin J. Tobin, Executive Director, Port of New York Authority).[14]

United States, based upon study and analysis, for the better conduct of the commerce passing in and through the port of New York, the increase and improvement of transportation and terminal facilities therein, and the more economical and expeditious handling of such commerce.

[14]On this point, a noted transportation expert, Michael N. Danielson, observed:

A good many people in the New York area, particularly in New Jersey, could see no point in creating another agency, whether bi-state or tri-state, as long as the Port of New York Authority apparently possessed both the jurisdiction and financial capacity to tackle the regional rail problem. Time and again, the Port Authority fended off these forays, emphasizing that there was an "absolute incompatibility" between railroad deficits and the PNYS'S contractual limitations with its bondholders . . . and to confine itself to self-supporting projects." [*Danielson, Federal-Metropolitan Politics and the Commuter Crisis,* 23 (1965)].

Finally, as previously noted, there has been a startling absence of tangible progress resulting from, or attributable to these investigatory efforts. This is true even though the Port Authority has recognized the commuter problems which beset the New York metropolitan area. As early as 1925, in its Annual Report, the Authority observed:

While hundreds of millions of dollars have been spent in urban rapid transit during the past decade, no commensurate amounts have been expended on suburban rapid transit, and the commuter has reached the limit of his endurance where the trunk lines leading into New York City are incapable of handling both suburban and through traffic. The passenger service of every railroad in the Port District is taxed to its limit by the requirements of this service. There is barely room during the rush hours for the trains carrying freight because of the commuter service, while passengers and freight must both necessarily move during these hours. [The Port of New York Authority, *Annual Report for 1924*, 23 (Jan. 24, 1925)]

See also The Port of New York Authority, *Annual Report for 1927*, 10, 53 (Jan. 20, 1928). Over the years, this recognition has increased with the realization of the expanding dimensions of commuter congestion and the inability of private transit facilities to cope with the problem. The Port of New York and New Jersey, 1972 *Annual Report,* 10–15 (1972); 1973 *Annual Report,* 10–15 (1973); 1974 *Annual Report,* 4–6 (1974).

The Port Authority's ineffectual investigative efforts cannot be attributed to a theoretical lack of jurisdiction in mass transit operations. Such jurisdiction was given to the agency in the Compact of 1921. Nor is the lack of success due to the financial inability of the Port Authority to assume additional obligations. As the trial court found, the Authority is not only financially sound, but has suffered no detrimental effects from the repeal of the protective 1962 Covenant:

Suffice it to say that between 1962 and 1974 the security afforded bondholders had been substantially augmented by a vast increase in Authority revenues and reserves, and the Authority's financial ability to absorb greater deficits, from whatever source and without any

significant impairment of bondholder security, was correspondingly increased. [134 *N. J. Super.* at 194–95]

Rather, the limited effectiveness of these studies is merely symptomatic of an underlying limitation which the Port Authority has imposed on its own involvement in mass transportation. This limitation, which is derived from a narrow construction of its statutory powers, precludes an undertaking by the Authority unless the relevant project will be financially self-supporting, or will only generate deficits within conservatively defined limits. While the definition of the limitation is presented in purely financial terms, its effect has been to severely restrict the scope of activities in which the agency may engage. Because the majority of mass transportation facilities are closely associated with high deficits, the practical operation of the Port Authority's self-imposed restriction has prevented the Authority from fulfilling its rapid transit obligations.

## C. *History of the Self-Supporting Concept*

While the provisions of the Compact and Comprehensive Plan sketched a broad authorization in terms of the activities which were within jurisdiction of the Port Authority, the powers accorded to it were not commensurate with its tasks. Without the necessary power, the Authority could not unilaterally support its statutory mandates, much less initiate action in their behalf:

An impressive body of activities was thus laid out wherein the Port Authority could formulate the needs of the port as a whole and be vigilant to protect its interests. It would serve as a focus and agent of the forces of unity within the port. The primary requirement in this field would not be legal power but adequate funds and continuous application. The Port Authority never lacked support with respect to the former, and was well conceived to function with respect to the latter. But success along this line of endeavor would depend upon cooperation from public agencies and private interests. Where conflicts developed it could make progress very slowly, if at all. [*Bard, supra,* footnote 2, at 58–59]

As a result of setbacks incurred in early legal skirmishes with the powerful railroads in the 1920's, the Port Authority appeared to assume a less assertive role in the port's development than that anticipated by its proponents. Reluctant to promote otherwise desirable activities within the Port District, the Authority restricted its goals to the dubious task of maintaining a balanced budget. The difficulty of this objective was compounded by the fact that under both the Compact and the Comprehensive Plan, the Port Authority had been denied the power to either levy assessments or pledge the credit of either state. The Port of New York Authority, *Annual Report for 1954,* vi (1954). Consequently, to offset the costs and losses which it incurred, the agency was dependent upon the revenues which it realized from its various projects and facilities.

While this new objective in the early years of the Port Authority was tempered by a "rule of economic practicability," The Port of New York Authority, *Annual Report for 1926,* 5 (Jan. 20, 1927), its importance was later elevated by the increased emphasis placed on self-sufficiency. In other words, because the fiscal stability of the Port Authority was dependent upon the revenues of its facilities, it was necessary for all projects to demonstrate their self-supporting capacity before the Authority would undertake their implementation. Thus, James C. Kellogg, III, the then Vice-Chairman of the Port Authority, read from a prepared statement before a Senate Commission in 1960, as follows:

In order that the Port Authority might carry out the tremendous and continuing task of developing the public terminal and transportation facilities of this metropolitan area, the two Legislatures clothed it with all necessary and appropriate powers of port and terminal development, with the important exception of the power to tax or to levy assessments. This reservation is the key to the whole concept of the Port Authority, which is that of a self-supporting agency, whose public projects are carried on through the development of their own revenues and charges, and which imposes no burdens on the general taxpayer. [*Hearings before N. J. Sen. Comm'n Created under Sen. Res. No. 7 (1960) to Study the Financial Structure and Operations of the Port of New York Authority,* September 27, 1960, 7-8 (Statement of James C. Kellogg, III, Vice-Chairman of the Port Authority)].

The objective of a self-supporting authority, while salutary in principle, was inconsistent with the Port Authority's original objectives and early history. In its annual report for 1924, the Authority explicitly rejected the self-supporting concept as a basis for its operations:

Preferably, and in the main, therefore, the Port Authority regards itself, rather as the guardian and guide of the Port District, protecting it against attacks both from within and without, and directing its activities and developments with a view to procuring the greatest cooperation of existing agencies, the utmost efficiency and the minimum of cost. *If such is to be its primary function it should not be expected to be self-supporting.* [The Port of New York Authority, *Annual Report for 1924,* 9–10 (Jan. 24, 1925) ; emphasis supplied]

Moreover, the self-supporting concept as a fundamental precept of the Port Authority's financial scheme is belied both by the projects upon which it embarked after its creation and by subsequent developments in its financial structure. As the trial court observed, because of the heavy investment required by these early projects, the Port Authority was confronted with large deficits from the outset. 134 *N. J. Super.* at 140. However, rather than restricting the Authority's activities, New Jersey and New York encouraged such projects by advancing funds, transferring control of lucrative facilities (such as the Holland Tunnel) to the Authority, and permitting the Authority to issue "open-ended" bonds. This latter device, in particular, helped free the Port Authority from absolute reliance on self-supporting projects. By placing all revenues derived from the sale of open-ended bonds into a common fund, the Port Authority was able to free deficit operations from the inadequate sales of their particular bonds. *Goldberg, A History of the Port of New York Authority Financial Structures,* 5 (1964). The pooling of resources not only permitted the Port Authority to finance debt-ridden facilities through those which were profitable, but simultaneously afforded bondholders a certain degree of security regardless of the success or failure of any given project. The open-ended financing of the Port

Authority, which was originally introduced in the form of the General Reserve Fund (*N. J. S. A.* 32:1–142), literally, the pool into which all funds were paid, was later expanded by the Authority's adoption of the Consolidated Bond Resolution in 1952. This resolution, which abandoned the practice of earmarking funds for specific projects, authorized the issuance of bonds whose revenues would be designated by the Authority for a given project according to its needs. As the trial court found, the resolution obviated any further concern for maintaining the self-supporting concept as a prerequisite to Port Authority involvement in a project:

> With the adoption of the CBR the "self-supporting" facility concept which had governed earlier authority financing ceased to have the significance previously attached to it; for under the CBR the Authority's financial structure is based on a unitary enterprise concept and all revenues from all facilities are pooled. Individual facilities are not financed independently of the rest of the Authority. The facilities contribute their revenues for debt service on all Authority bonds according to their earning power and without regard to the amount of bonds issued for the construction of any particular facility. [134 *N. J. Super.* at 143]

Enactments such as the General Reserve Fund and the Consolidated Bond Resolution created the possibility for the involvement of the Port Authority in traditionally deficit operations such as mass transportation. Nonetheless, the translation of this new financial freedom into practical action was not forthcoming from the Port Authority:

> That cashbox, so long empty, was full now, thanks to the postwar traffic boom, . . . the Port Authority's was worth $700,000,000. Long on cash, moreover, the Port Authority was short on dreams. The visionaries who had created it were long gone from its councils; Julius Henry Cohen had been replaced by money men like Cullman and Colt and Pope whose eyes were brightened by the balances in the Authority's ledgers, not by the potentialities for improving the common weal that those balances represented. The purpose for which the Authority had been created — the development of an *overall* transportation system to knit together a great port — had been lost sight of for years. Plans the Authority had aplenty, of course, but unrelated plans, plans for individual projects, joined by no link other than the fact that their construction would return the agency profit. [*Caro, supra*, footnote 10, at 922–23]

The resultant program which the Port Authority pursued represented less of an integrated effort to organize and coordinate the commerce of the port of New York, and more of an administrative mish-mash with little cohesiveness or relation to the agency's statutory mandate. Thus, construction of a World Trade Center, with little or no relation to the activities for which the Port Authority was created, was suddenly elevated to an importance which transcended that of a more traditionally-regarded responsibility of the Authority such as mass transportation.

The underlying rationale for these actions was unmistakably attributable to retention of the self-supporting limitation to which the Port Authority had previously adhered. This was made clear by Executive Director Tobin of the Port Authority when questioned at a 1958 hearing about the manner in which future revenues and reserves would be committed:

Well, it is closed unless those future bond issues have to do with projects that can be made self-supporting and in which the Commissioners of the Port Authority will not only certify as *a matter of conscience* and a matter of record that they believe that they can be made self-supporting and will add to the general credit of the Port Authority; but also if they can demonstrate arithmetically on sound projections of its existing net revenues and its maximum future debt service that those projects will not hurt this bondholder. That's all he has. If that bondholder has an open end bond without those restrictions, he has a piece of paper. [*Assembly Hearings, supra,* November 24, 1958, at 38 (Statement of Austin J. Tobin, Executive Director, Port of New York Authority); emphasis supplied]

This self-limitation has exacerbated the Port Authority's demonstrated lack of initiative. For example, although the Port Authority in 1955 agreed to provide the Metropolitan Rapid Transit Commission with $800,000 for that body's study of a metropolitan scheme of mass transit, the price which the Authority extracted for its financial support was a "Memorandum of Understanding" which precluded its own role in any deficit operations which the Commission

might recommend. *Danielson, supra,* footnote 14 at 23; *Assembly Hearings, supra,* December 3, 1958, at 91–A to 92–A (Statement of Frank H. Simon, Executive Director, Metropolitan Rapid Transit Commission). More importantly, perhaps, the Port Authority's inertia has interjected itself in the relationship between the agency and the Legislatures which it allegedly serves. This has been done in an often contradictory fashion as illustrated by the following discussion between Assemblyman Crabiel and Executive Director Tobin:

ASSEMBLYMAN CRABIEL: What I'm getting at here is, you're saying categorically that you cannot take a deficit. Now, I'm raising the point that as far as the Legislatures of the two states, when they established the compact there was nothing in the compact and nothing in the instructions from the Legislatures to the Port Authority that they could not undertake a deficit operation.

MR. TOBIN: Well, excuse me, sir. I'd say that there was. I would say that the way the statutes are phrased, it could undertake nothing except a self-supporting operation. We have no way of financing anything but a self-supporting operation.

ASSEMBLYMAN CRABIEL: Well how do you account for the fact, then, that you have operated deficit operations?

MR. TOBIN: Because the pooled revenues have been sufficient. Because we believed also, when we went into those, that they could be self-supporting and we were wrong.

ASSEMBLYMAN CRABIEL: That's what I was pointing up. [*Assembly Hearings, supra,* November 24, 1958, at 45]

III

## THE ROLE OF THE PORT AUTHORITY

Ultimately, those who are most hurt by the Port Authority's failure to enter the field of mass transportation are, of course, the commuters. Absence of Port Authority initiative in this area is a direct reflection of the deficits which are inherent in the provision of this public service:

Until the late 1950's, transit operations in the United States were generally profitable and, consequently, attractive to investment. Decline in patronage and increasing labor and equipment costs have completely reversed this trend to a point where today, public transit in its everyday operations in most cities is a losing proposition. The losses are not as great as sometimes presumed but, in most

cases, average between 20 and 25 percent annually. Therefore, public transit — like many other sectors of the transportation industry, including private automobile transportation — now requires substantial public support in the form of direct financial subsidies to be capable of rendering necessary services. [Roeseler and Levi, "State Subsidies for Public Transit: An Overview of Current Legislation," 4 *Urban Lawyer* 59, 60 (1972)]

See also Kneafsey and Edelman, "A Market-Oriented Solution to the Northeast Railroad Dilemma," 41 *I. C. C. Pract. J.* 174 (1973–74). This problem concerning the financial weaknesses of mass transit facilities has been realized within the New York metropolitan area. This, no doubt, has resulted from both the unusually heavy demands which have been placed on these systems in the Port District, and the lack of a perceived common interest among the District's geographic and political components. *Danielson, supra,* footnote 14 at 21–22.

The Port Authority's failure to assume an active role in solving this problem has had a concurrent effect on the traveling habits of the average commuter. Faced with increasing service cutbacks and escalating fares, the commuter is left with fewer alternatives to the private automobile. Grubb, "Urban Transportation Alternatives to the Automobile," 39 *I. C. C. Pract. J.* 19 (1971–72); Cooper, "Prospects for a Mass Movement to Public Transit," 5 *Urban Lawyer* 679 (1973). His increasing resort to this mode of transportation in turn has caused a drastic increase in traffic congestion and air pollution which are commonly associated with the metropolitan area.

These problems have stimulated legislative responses on both the federal and state levels. The federal response consists primarily of the Urban Mass Transportation Act of 1964, 49 *U. S. C. A.,* § 1601 *et seq.,* which purports to encourage "the planning and establishment of areawide urban mass transportation systems needed for economical and desirable urban development, with the cooperation of mass transportation companies both public and private." 49 *U. S. C. A.,* § 1601. See Haley and Watkins, "The Urban Mass Transporta-

tion Assistance Act of 1970 — A Federal Program Comes of Age," 16 *N. Y. Law For.* 741 (1970). As a corollary to the urban mass transit crisis, the federal government has enacted the Clean Air Act, 42 *U. S. C. A.*, § 1857 *et seq.* Similar considerations produced comparable legislation in New Jersey, Emergency Energy Fair Practices Act of 1974, *L.* 1974, *cc.* 2, 6; Executive Order No. 1 (Feb. 5, 1974).

These legislative enactments were most recently recognized in a report issued by the Joint Transportation and Communications Committee of the New Jersey Legislature. *Report of the Senate and General Assembly Joint Transportation and Communications Committee (Pursuant to Assembly Concurrent Res. No. 211 of 1974),* October 6, 1975. As the report noted:

The legislation passed by New Jersey during the last four years clearly reflects the determination on the part of its officials to direct the Port Authority towards making a greater financial commitment to mass transit. In order to determine whether New Jersey has been treated by the Port Authority in a fair and impartial manner the Committee has investigated the degree of Port Authority responsiveness to meeting the mass transportation needs of the State. [*Id.* at 13]

The Committee's conclusion was succinct as it was unfortunate:

The Committee recognizes that the Port Authority has acquired a reputation for its engineering, planning and management skills. It is the conclusion of the Committee, however, that in the area of mass transportation the Port Authority's performance has not been satisfactory. [*Id.* at 17]

The Committee's conclusions were premised upon the same type of factors which I have considered above. While the Committee was hopeful that the Port Authority would take its mass transportation responsibilities "more seriously" in the future, it nonetheless pledged "its vigilance to see that the

Port Authority completes the mass transportation projects it has promised to complete." *Id.* at 18, 19.[15]

The sensitivity of the state government to the urgent need for more modern means of public transportation has not been confined to the legislative branch. In his recent "State of the State" address, Governor Byrne not only recognized this problem, but concurrently cited the Port Authority's responsibility for its solution. Perhaps even more important, the Governor indicated his willingness to impose an affirmative sanction on the Port Authority should the desired action in the area of mass transit not be forthcoming:

> How do we keep the railroads running at a time when the state subsidy program costs over $100 million a year and has been growing by more than 35 per cent a year? Should there be an overall operating agency for these lines? What about the communities and industries served by lines soon to be abandoned? Where can we find the $255 million required to match federal funding for the

---

[15]While the history of the Port Authority's involvement in mass transportation has been discouraging, the prospects for renewed efforts by the agency in this area of endeavor are hopeful. In the above cited report by the Legislature's Joint Transportation and Communications Committee, the development of a mass transportation plan by the Port Authority was noted. *Report of the Senate and General Assembly Joint Transportation and Communications Committee (Pursuant to Assembly Concurrent Res. No. 211 of 1974,* 16–17 (October 4, 1975)). This plan committed the Port Authority to the provision of additional direct rail service to Penn Station in New York City for New Jersey commuters, the expansion of the Midtown Bus Terminal, the construction of a rail link to Kennedy Airport and the extension of the PATH system from Newark to Plainfield. Although the Urban Mass Transportation Administration on December 19, 1975 rejected New Jersey's request for $278-million to construct the PATH extension, the State's expressed intention to reapply for such funds will create the possibility of a continued role for the Port Authority in mass transportation. *The Sunday Star-Ledger,* December 21, 1975, at 1, 8; *The New York Times,* December 22, 1975, at ——; *The New York Times,* January 4, 1976, at 34. This persistence has apparently been successful as federal approval of a $400-million block grant for the PATH extension to Plainfield and other mass transit projects is anticipated. *The Star-Ledger,* February 10, 1976, at 1.

modernization of two major commuter lines and the extension of PATH to Plainfield?

The Port Authority of New York and New Jersey must increase its commitment to these efforts. If it is unwilling to do so, we will insist that it rescind the toll increases instituted last year for the specific purpose of funding improvements in the public transportation system. [Annual Message of Governor Brendan T. Byrne, Jan. 13, 1976, at 19]

I, too, would similarly take this opportunity to demonstrate the vigilance which has motivated the Joint Committee and the Governor. The Port Authority has too long neglected the responsibility with which it was statutorily charged in 1921. In *So. Burlington Cty. NAACP v. Tp. of Mt. Laurel,* 67 *N. J.* 151, 189 (1975), we recognized the significance of transportation to the overall development of an urban area. I would today reaffirm this significance.

## IV

## *CONCLUSION*

The relief which I recommend today is intended as an answer to a problem which has assumed crisis proportions. The Port Authority is the producer, the director and the main character of the play known as "The Disease of Mass Transportation." This malady has suffered too long from the benign neglect of public agencies such as the Port Authority, and such neglect has permitted the disease to spread unattended. The resulting state of affairs may most accurately be described as one of emergency. While the appellation "emergency" was at one time reserved for calamitous and natural occurrences, the inadequate and deteriorating quality of mass transit in the metropolitan area has had an eroding effect on the urban environment in which it operates. This effect has been measurable not only in terms of the unending lines of commuters who have been inconvenienced by inefficient service, but also in terms of traffic congestion with its attendant pollution as well. The courts of this country have long recognized that such emergent circumstances may

serve as a mandate to administrative action. "While emergency does not create power, emergency may furnish the occasion for the exercise of power." *Home Building & Loan Ass'n v. Blaisdell,* 290 *U. S.* 398, 425–26, 54 S. Ct. 231, 235, 78 *L. Ed.* 413, 422 (1934) ; *Hourigan v. North Bergen Tp.,* 113 *N. J. L.* 143, 148 (E. & A. 1934).

For an Authority that is long on cash and short on dreams,[16] it is time to respond for those who have long suffered the inconvenience and expense which have resulted from the Port Authority's inaction.

I would order the Port Authority, its Commissioners and its Executive Director to not only complete those projects to which it is already committed, but to formulate and present plans and suggestions for a regional mass transportation scheme to the Legislatures of New York and New Jersey. Implicit in this would be the requirement that such efforts be completed in an expeditious fashion and within a fixed period of time. This injunction is necessary to bring home the importance of Authority action in the face of the current transportation crisis.

In proposing this relief, I should not be understood as advocating usurpation of the functions of either the executive or legislative branches of government. The majority's characterization of my position is in error. *Ante* at 259. My disposition does not contemplate ordering either the Governors or the Legislatures of the States of New Jersey and New York to undertake any particular course or courses of action. I would be loathe to intrude upon the relationships which have developed between these other branches of state government and the Port Authority. Nonetheless, I am all too aware of the fact that expertise in the field of mass transit operations resides in the body which was originally vested with both power and jurisdiction in that area, namely the Port Authority. By according the Authority a statutory mandate to

---

[16]*Caro, supra, footnote* 10 at 922.

undertake mass transportation projects, it was anticipated by both States that the Port Authority would actively research, promote and recommend projects to be authorized and implemented by the State Legislatures. It is precisely the Port Authority's reluctance to utilize its expertise that has frustrated this basic first step towards the development of a much-needed integrated mass transportation system in the metropolitan area. Therefore, I would order the Port Authority to proceed with this initial planning stage, while, at the same time, acknowledging that ultimate adoption and implementation of the resultant plans remain a legislative and executive prerogative. The declared willingness of those branches of government to adopt appropriate measures leaves me confident that only timely suggestions by the Port Authority are needed to point the direction towards improved mass transit operations.

Although I am unsure whether it is the perception of my suggested order as a usurpation of executive and legislative function which underlies the majority's disagreement with such relief, I am, nonetheless, clear in my opposition to the lesson in civil procedure which the majority would impose on this case. I find that the majority's exercise of power under a writ of *mandamus* would ill-befit a remedy with such a Marshallian association. *Marbury v. Madison, 5 U. S.* (1 Cranch) 137, 2 *L. Ed.* 60 (1803). This is a direct result of not only the restrictive but the erroneous construction which the majority gives to the powers implicit in a *mandamus*. The writ of *mandamus* is a remedial process whose essential function is to compel the performance of a ministerial action *or the exercise of a discretionary function. Roberts v. Holsworth,* 10 *N. J. L.* 57 (Sup. Ct. 1828) ; *Switz v. Middletown Tp.,* 23 *N. J.* 580 (1957). This mode of relief is particularly appropriate with regard to recalcitrance by public officials or authorities. *Bd. of Taxation v. Belleville,* 92 *N. J. Super.* 338, 340–41 (Law Div. 1966). While the court has the power under a *mandamus* to compel action, it does not similarly have the power to control discretion in the performance of

the designated action. Such discretion properly resides in the functioning authority.

By its construction of the *mandamus*, the majority would not only accord the authority discretion in the manner of performing the compelled action, but would permit the authority discretion as to whether the ordered action should be performed at all. Although the majority has recognized that the Port Authority has resisted efforts to promote its involvement in mass transportation, it would consider this to be an exercise of discretion which would preclude a *mandamus* or an order similar to the one which I have suggested:

> As we have sought to demonstrate, the circumstances before us do not at all invite or accommodate the remedy proposed. This is so because the Authority (whose function is clearly not ministerial) has in fact exercised its discretion, even though that exercise has resulted in the rejection of a policy favoring mass transportation. Being a judgment decision its wisdom may be open to dispute; but as to the propriety of this Court's refusal to intrude on the underlying policy determination, there can be no question in the circumstances before us. *Ante* at 259.

I cannot subscribe to such reasoning, whose circular nature would undercut the relief which the majority otherwise feels is warranted under the circumstances and which would effectively emasculate the *mandamus*, or any similar relief, as a remedy.

I reject the majority's approach to the problem of this case within a procedural context. We have been taught that there are no rights without remedies. By stripping us of our remedies, the majority is most assuredly divesting us of our rights. *Marbury v. Madison, supra,* 5 *U. S.* (1 Cranch) at 163, 2 *L. Ed.* at 69. Furthermore, we have long passed the days wherein cases were decided on the niceties of procedural technicalities. *Hodgson v. Applegate,* 31 *N. J.* 29, 43 (1959); *Edelstein v. Asbury Park,* 51 *N. J. Super.* 368, 385 (App. Div. 1958). There is no need to resurrect in this case another of these manifestations of by-gone days.

Even if I were to acknowledge the necessity of specifically resorting to a *mandamus* or its equivalent, I could not justify withholding such relief in this case; nor can I presently understand the distinction which the majority draws between the *mandamus* which they recommend and the order which I propose. Granting that mandamus is an "extraordinary remedial process," *Beronio v. Pension Comm'n of Hoboken,* 130 *N. J. L.* 620, 623 (E. & A. 1943), aff'g 129 *N. J. L.* 557 (Sup. Ct. 1943), I cannot see the unfortunate plight of the more than 30 million commuters who are dependent upon the Port Authority's transportation services annually, nor the Authority's benign neglect of their plight, as being anything less than extraordinary. This is particularly so where to adopt the majority's approach would permit the Port Authority to ignore the statutory responsibilities with which it was charged in 1921.

The majority in *Gaby v. Port of New York Authority* has been unwilling to take the action which I regard as imperative. From its disposition I must, therefore, respectfully dissent.

*For affirmance*—Justices MOUNTAIN, SULLIVAN and CLIFFORD and Judges CONFORD, CARTON and HALPERN—6.

*Concurring in part and dissenting in part*—Justice PASHMAN—1.